In re Nadeem **NAJAFI**, Debtor.

Nadeem **NAJAFI**, Plaintiff,

v.

**CABRINI COLLEGE**, Defendant.

Bankruptcy No. 92–17427S.
Adv. No. 93–0034S.

United States Bankruptcy Court,
E.D. Pennsylvania.

May 13, 1993.

186

Robert F. Salvin, Philadelphia, PA, for debtor.

Edward L. Berger, Philadelphia, PA, for Cabrini College.

Stephen Raslavich, Philadelphia, PA, trustee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

The instant contested matter and proceeding present two "student loan" issues arising from an unusual set of facts: (1) Is the bill of a private college for tuition, based upon a student-debtor's registration for, and brief attendance of, classes, where no prior agreement for payment had been made, an obligation within the scope of 11 U.S.C. § 523(a)(8)? and (2) Does that college violate 11 U.S.C. § 362 when, under these circumstances, it refuses to supply an official copy of the Debtor's transcript to another institution of higher learning at the Debtor's request?

We answer the first question in the affirmative, at least to the extent of the value of the "educational benefit" which we find that the college provided to the Debtor, which we fix, under the circumstances, at $750. We answer the second question in the negative, because we find that the college has a special interest in the transcript which it is not obliged to forfeit unless it receives adequate protection therefor. In this instance, we conclude that a payment of $300 towards the Debtor's $750 obligation is deemed to be adequate protection to the college.

## B. PROCEDURAL AND FACTUAL HISTORY

On December 3, 1992, NADEEM NAJAFI ("the Debtor") filed an individual voluntary Chapter 7 bankruptcy case. On January 11, 1993, the Debtor filed the contested matter before us, a motion to hold CABRINI COLLEGE ("Cabrini") in contempt for its alleged violation of the automatic stay in refusing to release the transcripts of his grades at Cabrini per the request of the Debtor ("the Motion"). On January 19, 1993, the Debtor filed the adversary proceeding presently before us, a Complaint to declare his debt to Cabrini dischargeable, and to obtain damages from Cabrini for allegedly delaying his education and violating the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.* (referenced here by its generic description as a law regulating *un*fair and *de*ceptive *a*cts and *p*ractices, or "UDAP"), and breaching an alleged "fiduciary duty" to him.

A hearing on the Motion was initially scheduled on February 9, 1993. This court, expressing its requisite deference to the decision in *Johnson v. Edinboro State College*, 728 F.2d 163 (3rd Cir.1984), refused to provide any relief to the Debtor pending the outcome of the dischargeability issue in the Proceeding. Therefore, we continued the hearing on the Motion to March 12, 1993, the initially-established trial date of the Proceeding.

On February 18, 1993, Cabrini filed an Answer to the Debtor's Complaint which included a Counterclaim for $4,430 tuition allegedly due, plus attorney's fees. The Debtor filed a Reply to the Counterclaim on March 16, 1993, prior to the March 23, 1993, date to which the parties agreed to continue the consolidated hearing on the Motion and trial of the Proceeding.

The only witness at the hearing/trial was the Debtor, a 24–year–old man who related a strange and sad tale.

From 1986 through 1991, the Debtor testified that he was, from time to time, a student at Cabrini. His mother, who worked at the University of Pennsylvania and with whom he then resided, provided his full tuition through a tuition exchange program.

Due to poor grades, the Debtor's status descended from full-time status, to part-time status, to "involuntary withdrawal" from Cabrini. His transcript, through summer, 1990, a copy of which was ironically provided to the Debtor through discovery and appears in the record, fixed his cumulative grade point average was 1.797. The Debtor's attempt to return to Cabrini

during the 1990–91 school year resulted in additional poor grades and another withdrawal from school.

In August, 1991, the Debtor's fortunes took a short but spectacular turn for the better. During a three-day period, the Debtor, beginning with a $300 stake, won over $100,000 playing blackjack at an Atlantic City casino. As a result of his winnings and his articulated intention to utilize his winnings to assist homeless persons, the Debtor received extensive favorable publicity in the media, including a front-page story in the Philadelphia Inquirer. Most of the stories reported that the Debtor was a student at Cabrini, which provided some measure of favorable publicity to that school.

In fall, 1991, the Debtor approached Cabrini about the possibility of completing his degree and being readmitted as a full-time student. Even though his grades had been poor, and his formal application for admission was not sent to Cabrini until after August 26, 1991, Cabrini formally accepted the Debtor as a full-time student and permitted him to register by September 4, 1991, for classes to begin the next day.

The Debtor testified that, although Cabrini's policy was that students could not register for, or begin attending, classes without paying their full tuition in advance, Cabrini permitted the Debtor to register and to begin classes without making any advance payment. Furthermore, there were no communications between the Debtor and Cabrini officials as to what arrangement for payment of tuition would be expected. The Debtor testified that he believed that, due to his newly-acquired "celebrity" status, Cabrini intended to waive any tuition payments. He admitted, however, that no statements promising or even suggesting such munificence on the part of Cabrini were made to him. Cabrini's Answer to the Complaint suggests that it expected the Debtor to pay the tuition bill as soon as possible, but was willing to give him some leeway, due to his perceived wealth.

At this point, the Debtor's good fortune had, perhaps predictably, run its course.

The Debtor returned to the casinos, and, there, he gambled on sporting events and business ventures. He was spectacularly unsuccessful. By November, 1991, the Debtor had not only lost all of his winnings, but also had become drowned in debt.

The Debtor's renewal of his career at Cabrini continued on a similar adverse course. He testified that, after attending classes for about two weeks, he became ill and began to suffer from severe emotional trauma which prevented his returning to Cabrini. Although he testified that his mother and sister reported his illness to Cabrini, he provided no "official" or written notice of his withdrawal from school to Cabrini. Therefore, at the end of the semester, Cabrini billed him for $4,430, the full tuition for that semester.

In fall, 1992, recognizing that Cabrini would not accept him back again in view of his most recent debacle, the Debtor applied to Eastern College ("Eastern"). However, Cabrini thereupon refused to release his transcripts to Eastern unless his tuition bill was paid in full.

After filing his bankruptcy case, the Debtor reiterated his request to Cabrini to release his transcripts to Eastern. Cabrini, however, refused to release the transcripts, claiming that the collection of its tuition bill was not stayed by his bankruptcy filing and that his debt to it was nondischargeable in his bankruptcy case by reason of 11 U.S.C. § 523(a)(8).

## C. DISCUSSION

1. THE DEBTOR'S OBLIGATION TO CABRINI IS WITHIN THE BROAD SCOPE OF THE DEFINITION OF THE "STUDENT LOAN" CONTAINED IN 11 U.S.C. § 523(a)(8), AS AMENDED IN 1990, ALTHOUGH WE DETERMINE THAT THE DEBTOR'S LIABILITY TO CABRINI FOR HIS "EDUCATION BENEFIT" IN THE 1991–92 FALL SEMESTER IS LIMITED TO $750.

11 U.S.C. § 523(a)(8) of the Bankruptcy Code presently reads as follows:

## § 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.     .     .     .     .

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend unless— ...
[exceptions exist which the Debtor agrees are inapplicable].

As was noted in *In re Pelkowski*, 990 F.2d 737, 740 n. 6 (3rd Cir.1993), Congress amended this Code section on November 29, 1990, effective 180 days thereafter. Prior to these amendments, 11 U.S.C. § 523(a)(8) had read, in pertinent part, as follows:

## § 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.     .     .     .     .

(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution, ...

The Debtor concedes that he owes a "debt" to Cabrini. However, he posits, first, that § 523(a)(8) is to be narrowly construed, principally because the language does not include all "educational debts," as did the model act originally drafted by the Commission on the Bankruptcy Laws of the United States which was the precursor of the Code, REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, House Doc. 137, Part II, 93rd Cong., 1st Sess., at 136 (1973), reprinted in 2 APP. COLLIER ON BANKRUPTCY (15th ed. 1993). He then parses § 528(a)(8) as only referencing three categories of nondischargeable "debts:" (1) a "benefit overpayment;" (2) a "loan;" or (3)

"an obligation to repay funds received as an educational benefit, scholarship or stipend."

As can be noted from comparing the two versions of § 523(a)(8) quoted at pages 188–89 *supra*, the provisions of § 523(a)(8) effective prior to 1991 included only "debts" which constituted "educational loans" within their scope. Four cases have been located which interpreted the term "educational loan" under that version of the Code. The earliest decision, *In re Shipman*, 33 B.R. 80 (Bankr.W.D.Mo. 1983), holds that an unearned salary advance to a college student enrolled in a work-study program was not an "educational loan." By way of contrast, the next decision, *In re Hill*, 44 B.R. 645 (Bankr.D.Mass.1984), concludes that an indebtedness for tuition which accrued while a student athlete was awaiting receipt of a student loan *was* within the scope of § 523(a)(8). Without citing *Hill*, *In re Ellenburg*, 89 B.R. 258, 261–62 (Bankr. N.D.Ga.1988), concludes that a student who attended two colleges under the mistaken belief that her mother was paying the tuition did *not* make a "loan" covered by § 523(a)(8). The final and the only appellate decision in this line of cases is *In re Merchant*, 958 F.2d 738, 739, 740–41 (6th Cir.1992), which involved a foreign student who made a loan from a bank to pay her tuition, the terms of which gave the bank full recourse against the college. In reversing the decisions of the lower courts that the debt of the student was not an "educational loan," the court states that it finds the analysis of *Hill* "persuasive," *id.* at 741, and it quotes with approval a passage in *Shipman* stating that "the 'central issue in determining dischargeability is whether the funds were for educational purposes, not whether the funds constituted a loan.' " *Id.* at 741 n. 6, quoting *Shipman, supra,* 33 B.R. at 80.

█ The weight of this authority supports the conclusion that the advance of credit by Cabrini to the Debtor was, to at least the extent of part of the semester's tuition, an "educational loan," and hence nondischargeable under the previous ver-

sion of § 523(a)(8). It therefore follows that under the new, broader version of § 523(a)(8), the instant debt of the Debtor to Cabrini should be deemed nondischargeable.

We agree with the Debtor that it is difficult to characterize the instant as "an obligation to repay funds." No funds were received by the Debtor from either Cabrini or any lending institution during the pertinent period. However, we cannot accept the Debtor's argument that his obligation to Cabrini should not be characterized as a debt "for an educational benefit overpayment" made to him.

We believe that the absence of commas in the phrase "educational benefit overpayment or loan made" makes this phrase difficult to interpret. However, as *Pelkowski, supra,* teaches, 990 F.2d at 742–44, there is no support for the Debtor's contention, similar to that asserted by the *Pelkowski* debtor, that § 523(a)(8) must be read narrowly. We believe that, when reading the Code section more broadly than the Debtor suggests, the terms "benefit," "overpayment," and "loan" should be construed as a series of nouns, all modified by the adjective "educational." There is little logical reason for linking "benefit" with "overpayment," as does the Debtor in his proposed reading of this section. Clearly, the Debtor was the recipient of an "educational benefit" from Cabrini. Therefore, we conclude that his debt, assuming *arguendo* that it could not be classified as an "educational loan," falls within the scope of § 523(a)(8).

Moreover, assuming, once again *arguendo,* that we adopted the Debtor's linkage of "benefit overpayment," we are not certain that the result would change. If anything could logically be termed as an "educational benefit overpayment," it would be an instance where a student received an educational benefit which was in excess of that for which the student paid. The Debtor's receipt of educational benefit for which he failed to make any payment would appear to meet this definition.

We therefore conclude that, because the Debtor received an educational benefit from Cabrini for which he completely failed to pay, his "debt" to Cabrini must be found to be within the scope of § 523(a)(8), at least to some extent.

■ However, our finding that the Debtor is liable to Cabrini, principally because it bestowed an uncompensated "educational benefit" upon him, is not without a price to Cabrini. Analyzing the benefit to the Debtor also supports the conclusion that it is inequitable to allow Cabrini to charge the Debtor the $4,430 tuition payable for the entire 1991–92 fall semester. Cabrini offered no evidence to rebut the Debtor's testimony that he only attended classes in that semester for about two weeks before he succumbed to physical and mental illness. For purposes of symmetry, although it is technically irrelevant to the determination of the issue of the extent to which the Debtor received a benefit from Cabrini, we observe that very limited resources of Cabrini appear to have been devoted to the education of the Debtor in that semester.

Since the Debtor only attended classes for about two weeks out of a semester of about fourteen (14) weeks, or one-seventh of the semester, it appears just to measure the value of the Debtor's benefit from Cabrini, from attending classes in the 1991–92 fall semester, at about one-seventh of $4,430 ($633), plus an allowance for Cabrini's performance of certain administrative actions on his part, or $750.

In arguing against any abatement of the Debtor's tuition due to his early withdrawal, Cabrini points to a portion of its undergraduate catalogue which provides as follows:

### DEPOSIT AND REFUND POLICY

. . . . .

A student who withdraws or is dismissed during the semester receives a refund only on tuition and room and board based on the following attendance schedule during the semester:

1 to 13 calendar days: 80%; 14 to 20 calendar days: 60%; 21 to 34 calendar days: 30%; 35 calendar days or more: no refund.

Calendar days for refund period begin on the first day classes are scheduled,

not the first day the actual class is held. The amount of a refund for withdrawal is based on the official date of withdrawal from a course and not the date the student stops attending a class. Students must officially withdraw in order for a refund policy to be honored. (see Academic Policies and Procedures, page 21).[1] ...

Cabrini contends that the Debtor never "officially withdrew" from school, and is hence liable for the entire semester's tuition.

We cannot accept this reasoning in this factual context. Although the Debtor was presumptuous in assuming that Cabrini intended to allow him to attend classes for free, it is true that there was no evidence of a "meeting of the minds" as to how and even whether the Debtor would pay tuition to Cabrini for the 1991–92 fall semester. There was no rebuttal to the Debtor's testimony that Cabrini's treatment of him was unique and possibly unprecedented. Since Cabrini was not adhering to its normal policies in its acceptance of the Debtor, it seems fair to us to decide the Debtor's liability to Cabrini on an equitable basis rather than by strictly applying the policies set forth in Cabrini's catalogue.

We therefore conclude that the Debtor is in fact liable to Cabrini for a nondischargeable debt within the scope of § 523(a)(8), but only to the extent of the $750 benefit which he received from Cabrini in the 1991–92 fall semester.

2. CABRINI HOLDS A SPECIAL INTEREST IN THE DEBTOR'S NORMAL RIGHT TO RECEIVE DISPATCH OF COPIES OF HIS TRANSCRIPTS TO THIRD PARTIES AND THEREFORE CABRINI NEED NOT DISPATCH THE TRANSCRIPTS UNTIL THE DEBTOR PROVIDES IT WITH ADEQUATE PROTECTION OF ITS SPECIAL INTEREST, WHICH WE DETERMINE TO BE A PAYMENT OF $300.

The issue of whether a private school violates one of the subsections of 11 U.S.C. § 362(a), or a public school violates either 11 U.S.C. § 362(a) or 11 U.S.C. § 525(a), in refusing a student-debtor's request to supply a transcript to the student or a third party at the student's request has been discussed in several cases. *See generally* Annot., *Validity, Construction, and Application of Statutes, Regulations, or Policies Allowing Denial of Student Loans, Student Loan Guarantees, or Educational Services to Debtors Who Have Had Student Loans Scheduled in Bankruptcy,* 107 A.L.R.Fed. 192, 206–12 (1992).

The earliest cases decided under § 523(a)(8) of the Bankruptcy Code in this area appear to be *In re Ware,* 9 B.R. 24 (Bankr.W.D.Mo.1991); and *In re Heath,* 3 B.R. 351 (Bankr.N.D.Ill.1980). Both of these decisions involve cases which were brought under Chapter 13 of the Code, and both concluded that the respective colleges, by failing to release the student-debtors' transcripts, violated 11 U.S.C. § 362(a)(6) of the Code, which prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." *Heath,* which involved a state university, also concluded that the institution's refusal to supply a transcript violated 11 U.S.C. § 525(a).

The next notable reported decision is *In re Howren,* 10 B.R. 303 (Bankr.D.Kan. 1980), a chapter 7 case in which the court followed *Heath* and held a state university's act of refusing to release a student-debtor's transcript on reasonable demand in the context of even a chapter 7 case violated both §§ 362(a)(6) and 525(a).

The unanimity in the developing case law in favor of student-debtors was halted by the decision in a chapter 7 case by the Third Circuit Court of Appeals in *Johnson, supra,* which is of course controlling on this court. Addressing only a § 525(a) claim in the context of student loans which the student-debtor conceded was nondischargeable, the *Johnson* court concluded as follows, 728 F.2d at 166;

---

**1.** Neither these pages nor their content were    placed in the record.

we can find no basis in the Bankruptcy Code to nullify [the college's] policy of withholding transcripts from those students who have made no payments on their educational loans, have not approached the college to arrange a more flexible payment schedule, and have not had their debts discharged.

5. We can find only one case, *University of Alabama v. Howren (In re Howren)*, 10 B.R. 303 (Bkrtcy.D.Kan.1980), which is inconsistent with the view that colleges may withhold transcripts from debtors whose educational loans are not dischargeable under Chapter 7. For the reasons outlined above, we decline to subscribe to the position expressed by the *Howren* court that a contrary holding would contravene the fresh-start policy of the Bankruptcy Code. *See In re Brinzer*, 21 B.R. 545 (Bkrtcy.S.D.W.Va. 1982).

As the footnote quoted above and the preceding footnote at *id.* n. 4 indicate, the court distinguished *Heath* and *Ware*, which involved Chapter 13 cases, from the Chapter 7 case before it. *Cf. In re Gathright*, 67 B.R. 384, 390–91 (Bankr.E.D.Pa.1986), *appeal dismissed*, 71 B.R. 343 (E.D.Pa. 1987) (student loan obligations were generally dischargeable in Chapter 13 cases brought under the Code prior to the November, 1990 amendments). *But cf. In re Patronek*, 121 B.R. 728, 729 n. 1 (Bankr. E.D.Pa.1990) (the 1990 amendments, by adding a reference to § 523(a)(8) in § 1328(a)(2), effectively overruled *Gathright* and rendered student loans generally nondischargeable in Chapter 13 cases). In the footnote quoted, the *Johnson* court also expressly declined to follow the result in *Howren, supra.*

Two decisions determining that colleges' retentions of transcripts in Chapter 13 cases were improper which were decided subsequent to *Johnson*, *In re Parham*, 56 B.R. 531, 533 (Bankr.E.D.Va.1986); and *In re Reese*, 38 B.R. 681, 682 (Bankr.N.D.Ga. 1984), refer with approval to *Johnson's* distinction between Chapter 13 and Chapter 7 cases. Since both *Parham* and *Reese* were Chapter 13 cases, relief was granted to the respective debtors, pursuant to § 525(a) as well as § 362(a)(6) in *Reese* in light of its applicability in that case, consistent with the distinction between the two chapters made in *Johnson.*

Three recent decisions are less deferential to *Johnson*. Most striking is the result in *Merchant, supra,* a pre–1990 amendment Chapter 7 case, on this issue. After concluding that the debtor's obligations to the college in issue was nondischargeable under § 523(a)(8), 958 F.2d at 740–41, as noted at pages 189–90 *supra*, the *Merchant* court proceeds to conclude, without citing *Johnson* and citing *Howren* with apparent approval, that the college's withholding of the debtor's transcript violated § 362(a)(6).

Two other recent Chapter 7 cases, *In re Gustafson*, 111 B.R. 282 (Bankr.9th Cir. 1990), *vacated on other grounds*, 934 F.2d 216 (9th Cir.1991); and *In re Carson*, 150 B.R. 228 (Bankr.E.D.Mo.1993), consider the issue of whether colleges violated 11 U.S.C. § 362(a)(6) when they refused to deliver educational transcripts of student-debtors upon their requests prior to determinations that the respective debtors' student loan debts were discharged. Although both cite to, and do not purport to contradict the result in, *Johnson*, the dissent in *Gustafson*, 111 B.R. at 289–90, argues that the majority decision ran counter to the *Johnson* holding that colleges need not provide transcripts until debts owing to them are determined to be nondischargeable.[2]

---

**2.** We note three other "transcript" decisions which are less pertinent than the foregoing to the issue at hand. In *In re Elter*, 95 B.R. 618 (Bankr.E.D.Wis.1989), the court decided that withholding a transcript did not violate § 525(a) because a student loan was not a "grant" within the scope of that Code provision. In *In re Dembek*, 64 B.R. 745 (Bankr.N.D.Ohio 1986), a public high school was prohibited, under §§ 525(a) and 362(a)(6), from withholding the transcript of the Chapter 7 debtors' son because the son was a non-debtor. *But cf. Pelkowski, supra.* Finally, in *In re Brown*, 12 B.R. 885 (Bankr.N.D.Ga.1981), the court held that the debtor's Chapter 13 bankruptcy did not render a withholding of a transcript of the debtor's daughter violative of the co-debtor stay.

This court does not have the alternatives of ignoring *Johnson,* as did the *Merchant* court, or of declining to follow it or its necessary implications, as did the courts in *Gustafson* and *Carson.* We do not agree with the Debtor's arguments that (1) we write on a clean slate in deciding whether Cabrini's actions violated § 362(a) because *Johnson* addressed only § 525(a) and not § 362(a); and (2) the facts of *Johnson* are distinguishable from the instant facts because *Johnson* concerned a debt which had been determined to be nondischargeable prior to the debtor's raising the issue that he was entitled to his transcript, while the dischargeability of the Debtor's obligation to Cabrini was in issue until the time of this decision.

Addressing the first point, we note that the considerations involved in determining whether refusing to supply transcripts violates § 362(a)(6) and/or § 525(a) appear to us to be the same. Many of the reported cases consider the two issues together, and every case either concludes that both Code sections have been violated by the college's actions or that neither section has been violated thereby. The fact that many of the cases which involve only § 362 claims discuss *Johnson*—including *Gustafson* (both the majority and dissent), *Carson,* and *Parham*—makes it clear that these courts identify the considerations surrounding § 525(a) and § 362(a) challenges of colleges' refusal to release transcripts similarly. We therefore cannot discount the precedential shadow of *Johnson* on the Debtor's § 362(a) claims even though *Johnson* technically involved only § 525(a).

We are also skeptical of the efforts of the *Gustafson* majority and *Carson* court to harmonize their holdings with that of *Johnson.* It is true that *Johnson* involved a situation where the student-debtor's loan obligation was already determined to be nondischargeable prior to the debtor's making a demand for his transcript, while the issue of dischargeability was still open in *Gustafson* and *Carson* when such demands were made. However, it seems illogical to confine *Johnson* to only those situations where the student-debtor either concedes nondischargeability or the decision regarding dischargeability precedes the assertion by the debtor of a violation of the automatic stay on the part of a college that seeks to retain a student-debtor's transcript. A student-debtor is unlikely to ever concede nondischargeability if the mere unproven assertion of dischargeability will preclude the college-friendly ruling of the *Johnson* case from becoming effective. The automatic stay, as its nomenclature suggests, automatically and immediately becomes effective upon a bankruptcy filing. The time of a determination of dischargeability can therefore *never* precede the timing of the effectiveness of the automatic stay. Hence, a savvy student-debtor would always be able to succeed in requiring a college to relinquish its transcripts, at least until a determination of nondischargeability is made. Thus, the logical extension of the reasoning employed by *Gustafson* and *Carson* is to render *Johnson* a complete nullity or at least greatly weaken its effect.[3] We do not think that we can properly interpret a controlling precedent in such a manner.

■ We have other logical difficulties with accepting the result reached by *Merchant, Gustafson* and *Carson.* If a college has determined, pre-petition, not to

---

**3.** Receipt of the transcripts alone in the student's own hands is rarely all that a student-debtor seeks in these cases. If it were, the Debtor's access to a copy of his Cabrini transcripts through discovery made in the course of these disputes would render the matters before us moot. Rather, what student-debtors are concerned with is the right to have their college send certified copies of the transcripts to recipients of their choice. It is possible that a college which is required to dispatch transcripts on request for violating the automatic stay pending a dischargeability determination could cease

sending transcripts upon request upon receipt of an order of non-dischargeability of the debt.

Of course, the savvy student-debtor will quickly exhaust his requests during the period in which the dischargeability issue is pending. For example, the Debtor apparently desires only that Eastern receive a transcript and would certainly proceed to direct Cabrini to do so if he were granted any window of opportunity to demand same. Therefore, if we rendered a decision consistent with *Gustafson* and *Carson,* we would be effectively providing complete relief to the Debtor.

supply a transcript at the request of a student-debtor, it is not clear why merely reiterating, but not escalating, that collection activity post-petition should constitute a violation of the automatic stay. Normally, a creditor is merely stayed from taking further post-petition collection activities by § 362(a)(6). However, a creditor is normally not required to undo collection actions taken pre-petition thereby, unless an avoidance power is successfully invoked against it. *See In re Golden Distributors, Ltd.,* 128 B.R. 342, 345–46 (Bankr.S.D.N.Y.1991) (no stay violation found in creditor's merely asserting rights against debtors); *In re Orsa Associates, Inc.,* 99 B.R. 609, 622–23 (Bankr.E.D.Pa.1989) (creditor's refusal to undo an allegedly avoidable pre-petition transfer is not a stay violation); and *In re TM Carlton House Partners, Ltd.,* 93 B.R. 859, 870 (Bankr.E.D.Pa.1988) (it is not a stay violation for a tenant of a debtor-landlord to withhold rent).

■ None of the courts which have considered "transcript-retention" problems have analyzed the respective property rights in the transcripts of the student-debtor on one hand and of the college on the other. We agree with the debtor's implicit assertion that he has at least certain property rights in his transcripts. They are recordations of the fruits of his labor. They would clearly appear to be within the broad scope of "property of the estate" of the Debtor. *See* 11 U.S.C. § 541(a).

■ However, a college has certain property rights in its student's transcripts, too. The college is the entity which makes the recordations and must utilize its administrative personnel to dispatch transcripts to third parties upon request. The refusal to supply transcripts is a logical response to a former student's failure to pay a bill, at least until the bill is determined to be a dischargeable debt. It appears to us that the college has a "special interest" in transcripts of its students, unless their debt is deemed nondischargeable, which is comparable to, if not legally the equivalent of, a security interest to protect the college for losses in engaging in its normal undertaking to supply the transcripts to third parties upon request. *See In re Shapiro,* 124 B.R. 974, 982–83 (Bankr.E.D.Pa.1991); and *In re Ford,* 78 B.R. 729, 736 (Bankr. E.D.Pa.1987). *Cf. Juras v. Aman Collection Service, Inc.,* 829 F.2d 739, 742–43 (9th Cir.1987), *cert. denied,* 488 U.S. 875, 109 S.Ct. 192, 102 L.Ed.2d 162 (1988) (a college is the owner of its transcripts, subject to the debtor's right of access to it).

■ Moreover, in a situation where a debtor seeks the return of property of the estate which a creditor retains on the basis of a pre-petition security interest or other special interest, the debtor is normally obliged to provide adequate protection to the creditor as a condition for the return of that property. *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983); *Shapiro, supra,* 124 B.R. at 982–83; and *Ford, supra,* 78 B.R. at 734–37. Thus, in most jurisdictions, in situations where the debtor seeks the turnover of a motor vehicle that a secured creditor has repossessed but not yet resold prior to a bankruptcy filing, the result has been that the debtor must both provide adequate protection to the creditor and seek affirmative relief to obtain a turnover. *See In re Richardson,* 135 B.R. 256, 258–60 (Bankr.E.D.Tex.1992); *In re Koresko,* 91 B.R. 689, 695 (Bankr. E.D.Pa.1988); *In re Loof,* 41 B.R. 855, 856 (Bankr.E.D.Pa.1984) (GOLDHABER, Ch. J.); *In re Attinello,* 38 B.R. 609, 610–12 (Bankr.E.D.Pa.1984) (TWARDOWSKI, present Ch.J.); and *In re English,* 20 B.R. 877, 879 (Bankr.E.D.P.1982) (KING, J.). We acknowledge the presence of a few decisions which hold that even a secured creditor's post-petition continued retention of a motor vehicle repossessed pre-petition is a violation of 11 U.S.C. § 362(a). *See In re Knaus,* 889 F.2d 773, 774–75 (8th Cir. 1989); and *Carr v. Security Savings & Loan Ass'n,* 130 B.R. 434, 437–38 (D.N.J. 1991). However, we agree with the observation of the *Richardson* court, 135 B.R. at 260, that the courts in neither *Knaus* nor *Carr* appear to have focused on the adequate protection requirement. We agree with the reasoning of *Richardson* and the

prior decisions in this jurisdiction which support it.

■ We therefore reject the assumption made by the Debtor and, we believe somewhat unfortunately, by the courts in *Merchant, Carson,* and *Gustafson* in comparable settings, that Cabrini's mere continued assertion of a pre-petition absence of an obligation on its part to supply the Debtor's transcript to third parties violates the automatic stay. As the *Gustafson* dissent, we believe properly, observes, 111 B.R. at 290, the Third Circuit Court of Appeals has also held, in *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 85–86 (3rd Cir.1988), that a creditor's communication to a debtor of its policies in dealing with that debtor's bankruptcy-filing event in the future is not violative of the automatic stay. *Accord, In re Saunders,* 105 B.R. 781, 786 (Bankr.E.D.Pa.1989) (FOX, J.) (college does not violate automatic stay in merely communicating an institutional policy supporting denial of a demand of a debtor).

We therefore conclude that it would be inconsistent with not only the decision in *Johnson,* but also the reasoning in *Brown* and decisions by all of the present and recent past judges of this court in motor vehicle repossession turnover actions, to find that Cabrini's retention of the Debtor's transcripts violated the automatic stay. Consequently, we will deny that aspect of the Debtor's Motion before us requesting that we hold Cabrini in contempt and award damages against it for an alleged violation of the automatic stay. We also reject the Debtor's prayer, in the Motion, that we order Cabrini to unconditionally release its transcripts upon his demand.

■ However, we find that the Motion, alternatively, presents a request for a turnover of the transcripts on appropriate conditions. We conclude that, if Cabrini is paid $300 towards the $750 non-dischargeable debt to it for which we find the Debtor liable, it will be adequately protected and should then provide the Debtor's transcripts as requested. We have chosen this figure because we believe that it is quite adequate to cover all of Cabrini's administrative expenses involved in supplying the transcripts and it will constitute a substantial, if incomplete, satisfaction of the Debtor's obligation to Cabrini.

3. OTHER MATTERS: WE WILL DECIDE CABRINI'S COUNTERCLAIM AND DENY RELIEF ON THE DEBTOR'S UDAP AND "BREACH OF FIDUCIARY DUTY" CLAIMS.

Having resolved the two major issues in this case, we will briefly address three other issues presented.

■ The first is the proper disposition of Cabrini's counterclaims against the Debtor. We believe that, in dischargeability cases, and particularly cases under § 523(a)(8), bankruptcy courts should not generally concern themselves with liquidation of the claims in issue, even if the debts in issue are found to be nondischargeable. *See In re Stelweck,* 86 B.R. 833, 844–45 (Bankr. E.D.Pa.1988), *aff'd sub nom. United States v. Stelweck,* 108 B.R. 488 (E.D.Pa. 1989). The state courts are generally better equipped than bankruptcy courts as forums to liquidate what are generally non-dischargeable state-law claims. The amount of a nondischargeable debt is of little or no relevance to the underlying bankruptcy case.

■ However, we also recognize an exception to the approach set forth in *Stelweck* necessarily arises in a situation where, like here, only a part of the debt in issue is declared nondischargeable. *See, e.g., In re Cirineo,* 110 B.R. 754, 762–63 (Bankr.E.D.Pa.1990). In such a case, it is necessary that this court actually determine what amount is due from the debtor to the creditor as a part of the decision on nondischargeability. We find that, in such circumstances, it is wasteful to send the parties back to the state courts, where principles of collateral estoppel will inevitably require those courts to reach the same result as this court. We will therefore enter a judgment in the amount of $750 in favor of Cabrini on its counterclaim in this instance.

The Debtor's UDAP claim against Cabrini is based upon Cabrini's alleged violation of a "covenant of good faith" with the Debtor. More specifically, the Debtor claims that Cabrini failed to "specify and disclose ... its relationship to the Debtor" and improperly proceeded to bill him for an entire semester's tuition. This court has concluded that the Debtor rightfully owes Cabrini $750, not the $4,430 entire semester's tuition which it seeks. However, we must concede that this is not a result which flows inevitably from the facts presented. Cabrini's argument that the Debtor never gave it "official" notice of his withdrawal and therefore should be liable for the entire semester's tuition, per the Deposit and Refund Policy in its undergraduate catalogue quoted at pages 190–91 *supra,* is a respectable argument.

In *In re Milbourne,* 108 B.R. 522, 533–35 (Bankr.E.D.Pa.1989), we held that conduct characterized by any of the following could constitute a violation of the UDAP "catch-all" provision, 73 P.S. § 201–2(4)(xvii); (1) conduct which constitutes common-law fraud; (2) conduct which constitutes a statutory violation; and (3) conduct which has been proven to be both unconscionable and pervasive in a creditor's dealings with a particular consumer or consumers generally.

Cabrini's actions in the instant fact setting do not come close to meeting any of these alternatives. There is no evidence of fraud, but rather evidence of merely a misunderstanding between the parties regarding tuition which the Debtor on his part helped to create. There was confusion about the Debtor's continued status as a student after he stopped attending classes, but this was mostly created by the Debtor's irresponsible failure to clearly communicate his withdrawal to Cabrini or any of his professors. There is no allegation that Cabrini's conduct violated any law. The facts of this case are unique: they do not easily lend themselves to any conclusions about Cabrini's general policies. Moreover, these policies, while applied in a somewhat hard-nosed, mechanical fashion by Cabrini in this instance, are not found by this court to be unconscionable *per se.*

The claim of Cabrini's breach of a fiduciary duty to the Debtor *qua* student is also extremely weak. It is based upon the unproven allegation that Cabrini controlled the Debtor's education and personal life, mostly because it provided him with advisors and counsellors. In *Bradshaw v. Rawlings,* 612 F.2d 135, 138–40 (3rd Cir. 1979), *cert. denied sub nom. Borough of Doylestown v. Bradshaw,* 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980), it was established that the modern American college does not stand *in loco parentis* to its students generally. *See also Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1365–69 (3rd Cir.1993); and *Alumni Ass'n v. Sullivan,* 524 Pa. 356, 364–65, 572 A.2d 1209, 1213 (1990). The Debtor, although he acted impulsively and immaturely in his dealings with Cabrini, was a older student, aged 22 or 23 years and hence clearly an adult, at the time of the events in issue. It is somewhat hypocritical for him to blame the school for his own self-destructive actions.

Therefore, to the extent that our decisions on the Debtor's other claims do not themselves preclude relief on these rather far-fetched alternative theories, such relief is expressly denied herein.

## D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

## ORDER

AND NOW, this 13th day of May, 1993, after a consolidated trial/hearing of March 23, 1993, of the Debtor's motion for contempt against Cabrini College ("Cabrini") in the above main case ("the Motion"), and the trial of the above proceeding ("the Proceeding"), it is hereby ORDERED AND DECREED as follows:

1. Judgment on the claim in the Proceeding is entered in favor of the Defendant CABRINI COLLEGE ("Cabrini"), and against the Debtor, NADEEM NAJAFI ("the Debtor"), on all counts.

2. The indebtedness of the Debtor to Cabrini, as found per paragraph 4 of this Order, is DECLARED nondischargeable.

3. All prayers of the Debtor for damages against Cabrini are DENIED.

4. Judgment is entered in favor of Cabrini and against the Debtor on Cabrini's counterclaim in the amount of $750.

5. The Motion is DENIED except insofar as it is DECLARED that the Debtor's payment of $300 to Cabrini is determined to be adequate protection of Cabrini's interests in the Debtor's grade transcripts.

6. Upon and only upon payment of the said $300, Cabrini shall comply with the Debtor's reasonable requests that these transcripts be supplied to third parties.