229 B.R. 552 (1999)
In re Kevin RENSHAW, Debtor.
Cazenovia College, Plaintiff-Appellee,
v.
Kevin Renshaw, Defendant-Appellant.
Bankruptcy No. 97-60985, BAP No. 98-50024, Adversary No. 97-70114A.
United States Bankruptcy Appellate Panel of the Second Circuit.
Argued October 16, 1998.
Decided February 5, 1999.
*553 *554 Stephen M. O'Neill, Lacy, Katzen, Ryen & Mittleman, LLP, Rochester, New York, for Cazenovia College, plaintiff-appellant.
Robert H. Lawler, Dewitt, New York, for Kevin Renshaw, debtor-appellee.
Before: NINFO, GALLET and BUCKI, JJ.

OPINION
NINFO, Judge.
This appeal arises from the March 9, 1998 Memorandum-Decision, Findings of Fact, Conclusions of Law and Order of Chief Bankruptcy Judge Stephen D. Gerling of the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court Order"). The Bankruptcy Court Order: (1) denied a Motion for Summary Judgment brought by Cazenovia College ("Cazenovia"); and (2) dismissed the Complaint of Cazenovia in its "Adversary Proceeding" against the debtor, Kevin Renshaw ("Renshaw"), to have a debt determined to be nondischargeable pursuant to Section 523(a)(8).[1] The Motion was denied and the Complaint dismissed because the Court found that the debt due to Cazenovia was not the result of an educational benefit overpayment or an educational loan made by Cazenovia to Renshaw as part of a program. For the reasons set forth below, we AFFIRM the Bankruptcy Court Order.
I. Facts
On February 8, 1992, Renshaw, then a high school senior, signed and returned to Cazenovia a "Reservation Agreement" which had been previously executed on behalf of Cazenovia by its Vice-President/Enrollment Manager. By executing the Reservation Agreement, which incorporated certain provisions from Cazenovia's "Catalog," Renshaw, and all other incoming students, agreed: (1) to pay a $285.00 reservation fee when the executed Reservation Agreement was returned; (2) to pay $1,695 for tuition, room and board for the 1992 summer session, or whatever charges were in effect on the date of registration for the summer session; (3) to pay $12,980 for tuition, room and board for the 1992-93 academic year, or whatever charges were in effect on the dates of registration for the Fall 1992 and Spring 1993 Semesters; (4) to be bound by the Refund Policy set forth on the back of the Reservation Agreement; (5) as required by the Catalog, to pay the tuition, room and board due for the Fall 1992 semester by no later than September 1, 1992, and the tuition, room and board due for the Spring 1993 semester by no later than January 1, 1993; (6) as specifically provided in the Catalog that "no student may register, graduate, receive grades or transcript of school records, or participate in room drawing until all family payments owed to the college have been made"; and (7) as required by the Catalog, to pay a "Service Charge" of 1.6% per month with an effective annual rate of 19.2%, if any amounts due on his student account, including tuition, room and board, were not paid by the due date as billed. By executing the Reservation Agreement, it does not appear that Cazenovia agreed or promised to do anything except: (1) to hold a place for Renshaw for the Summer Session and the 1992-1993 Academic Year, provided that he paid the amounts billed on his student account when due; and (2) not to charge Renshaw more for tuition, room and board than the amount in effect on any applicable registration date if those amounts were paid when due.
Although Renshaw did not pay the charges for tuition, room and board when due, Cazenovia allowed him to register, live and eat at the college and attend classes for the 1992 Summer Session and the 1992 Fall Semester. However, he did not return for the Spring 1993 Semester.
On March 17, 1993, after all payments and credits[2] were made to his student account, *555 Renshaw still owed Cazenovia $5,027.16.[3] On December 4, 1996, Cazenovia obtained a Default Judgment against Renshaw (the "Cazenovia Judgment") in the amount of $9,999.87, which included a total of $3,169.99 in accrued Service Charges at 19.2% per annum from July 1993 and an attorney fee award of $1,339.18.
On February 25, 1997, Renshaw filed a petition initiating a Chapter 7 case, and on May 8, 1997, Cazenovia filed its Complaint initiating the Adversary Proceeding.
II. Issue Presented
The issue presented by the parties on appeal is whether the Bankruptcy Court erred in determining that the amounts due on the Cazenovia Judgment were dischargeable because they were not, as required by Section 523(a)(8),[4] a debt for an educational benefit overpayment or loan made by Cazenovia as part of a funded program.[5]
III. Standard of Review
Rule 8013 of the Federal Rules of Bankruptcy Procedure determines this Panel's review of a Bankruptcy Judge's judgment, order or decree.[6] Accordingly, a Bankruptcy Court's findings of fact may not be set aside unless clearly erroneous, and a Bankruptcy Judge's legal conclusions are reviewed de novo. Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.), 93 F.3d 1036 (2nd Cir.1996).
The granting of a motion for summary judgment is also reviewed de novo. Sierra Steel, Inc. v. S & S Steel Fabrication (In re Sierra Steele, Inc.), 96 B.R. 271, 273 (9th Cir. BAP 1989); Bender v. Tobman (In re Tobman), 107 B.R. 20, 22 (S.D.N.Y.1989).
IV. Discussion
In the Bankruptcy Court Order, Judge Gerling found that in order for the Cazenovia Judgment to be excepted from discharge, Cazenovia, a nonprofit institution, was required to show, by a preponderance of the evidence, that it had made an educational benefit overpayment or an educational loan to Renshaw as part of a program, and he determined that Cazenovia had not met its burden to show that the debt was an educational benefit overpayment or educational loan and incurred as part of a program.
A. Educational Benefit Overpayment Made
We agree with the Bankruptcy Court that in 1990 when Congress amended *556 Section 523(a)(8),[7] it extended nondischargeability to debts for educational benefit over-payments made, but not for any debt which may have resulted from the debtor having received some consideration which could be considered to be an educational benefit.[8] To hold that Section 523(a)(8), as amended, extends to debts for all educational benefits would not be consistent with either the legislative history to the 1990 Amendment or a plain reading of the statute, as amended.[9]
B. Educational Loan Made
We also agree with the Bankruptcy Court that when Cazenovia provided Renshaw with certain goods and services (classes, room and board), which resulted in an unpaid balance due on Renshaw's student account, it did not make an educational loan which would be nondischargeable under Section 523(a)(8).
As a starting point to determine whether a transaction is a loan, we look to the commonly accepted definition used by the United States Court of Appeals for the Second Circuit in In re Grand Union Co., 219 F. 353 (2nd Cir.1914) ("Grand Union").[10] This definition requires that the lender and borrower intended the transaction in question to be a loan transaction, rather than, for example, a contract for the sale of goods and services for cash or as a credit sale, and that, in substance, there has been a transfer of funds from the lender to the borrower which the borrower has agreed to repay.
We believe that a plain reading of the Reservation Agreement, an agreement drafted by Cazenovia, indicates that when it was forwarded to Renshaw by the enrollment department, not the financial aid office, it was nothing more than an offer by Cazenovia to sell him, and the other incoming students, goods and services (classes, room and board) at the specific prices stated in the Agreement, or those in effect on any of the three registration dates referred to in the Agreement. The Reservation Agreement provided that: (1) the sales of the goods and services were to be cash sales because the amounts were to be paid in advance on or before the applicable registration date; (2) Cazenovia reserved the right to unilaterally extend any of the payment due dates and provide all or a portion of the goods and services on credit, thereby converting the contemplated cash sales into credit sales; and (3) in the event that Cazenovia exercised its unilateral right to convert the contemplated cash sales into credit sales, it could bill Renshaw for any unpaid portion of the sales price together with a Service Charge at the rate of 19.2% per annum.
When Renshaw executed and returned the Reservation Agreement, the parties had, at most, entered into a contract for the sale of goods and services for cash in advance, or, at Cazenovia's sole option, a credit sale[11] should Renshaw fail to complete the terms of the cash sales by paying the sales prices on or before the applicable registration date. This contract was enforceable by Cazenovia once it had provided Renshaw with all or any *557 portion of the goods and services contracted for (classes, room or board).
We agree with the Bankruptcy Court that Cazenovia and Renshaw intended the transaction evidenced by the Reservation Agreement to be a contract for the sale of goods and services, and not an educational loan, for several reasons.
First, the Reservation Agreement, by incorporating the terms of the Catalog, specifically provided that, if Renshaw failed to complete the contemplated cash sales by paying the amounts due for tuition, room and board on or before any registration date and Cazenovia unilaterally elected to convert the cash sale into a credit sale, the unpaid purchase price would accrue Service Charges at 19.2% per annum. This provision for Service Charges at a rate in excess of the 16% per annum interest permitted for loans by Section 5-501 of the New York General Obligations Law (the "General Obligations Law"), clearly indicated that Cazenovia intended this transaction to be a sale of goods and services and not a usurious loan. Cazenovia, by specifically providing for Service Charges on any unpaid balance due on Renshaw's student account, was insuring that the transaction would not be considered to be a usurious loan because Service Charges, even at a 19.2% annual rate, are not considered to be usurious interest.[12]
Second, the Reservation Agreement specifically provided that, "The above does not reflect financial aid, if any," and by reference to the Catalog, provided that,
The processing of a student loan will usually require four to six weeks. Therefore, where the proceeds of a student loan are to be applied to the payment of tuition and fees, application for that loan should be made early. The proceeds should reach the College by September 1 or within six weeks of the date on which the Reservation Agreement was signed, whichever is later. Should the sum due not be applied to the student's account within the period specified, the student may be required to leave the College.
Clearly, these conditions and consequences would have been unnecessary if the parties intended that the transaction evidenced by the Reservation Agreement was financial aid or a student loan rather than a contract for the sale of goods and services.
Next, there is no evidence that Renshaw ever specifically requested that Cazenovia provide him with an educational loan. Furthermore, there is no evidence that either before or at the time of the execution of the Reservation Agreement, or when he failed to pay the amounts due for tuition, room and board on or before the Summer 1992 and Fall 1992 registration dates, representatives of Cazenovia ever discussed with Renshaw his ability to pay the agreed tuition, room and board, or any financial needs that he might have had, including his need for an educational loan. In the absence of any request for an educational loan or any discussions regarding Renshaw's financial needs or ability to pay, where the terms of the Reservation Agreement do not clearly indicate that the parties were entering into a loan transaction,[13] we cannot conclude that the parties formed an intent to enter into an educational loan transaction. To do so would necessitate a finding that Cazenovia intended to make an educational loan to any and all incoming *558 Freshman who failed to pay their tuition, room and board when due.
Finally, a review of the case law on this issue shows that the mere nonpayment of tuition, without something more demonstrating a clear intent to make a loan, such as completing an application, exchanging correspondence regarding a loan, executing a promissory note, or conducting some negotiations or discussions, is a dischargeable debt.[14] In a case on point, In re Peller, 184 B.R. 663 (Bankr.D.N.J.1994), the Court determined that unpaid college tuition and housing debt was not an "educational benefit overpayment or loan" within the meaning of Section 523(a)(8). In that case, the student signed an Intent to Register form which: (1) required that the student send in a deposit to reserve a place in the freshman class; (2) stated the tuition and fees were due before registration; and (3) the student agreed to pay or make arrangements for payment of all fees and charges. The university alleged that it had "loaned" the student tuition based on the signing of the letter of intent. That argument was rejected because the mere fact that the university allowed a student to attend classes and receive final grades, did not mean that the university supplied the student with funds for his education. Neither the debtors nor their son had made any arrangements to borrow money to finance the student's education and the university only intended to provide educational services for which it would be paid. The Court concluded that to read the statute to include tuition and room and board would extend the meaning of a loan or an extension of credit beyond that contemplated by Congress, because the statute does not provide for the nondischargeability of any type of expenses associated with attending a college or university, and to extend Section 523(a)(8) to include these expenses where there was no loan, would contravene the plain meaning as well as the legislative intent of the statute.
Cazenovia has asserted that the Reservation Agreement evidenced a loan transaction because the Agreement satisfies the test for a loan adopted by the United States Court of Appeals for the Sixth Circuit in Merchant.[15]
The factors adopted by the Court in Merchant for determining whether there has been an educational loan may have been *559 helpful in the factual situation where the debtor executed a promissory note which provided for repayment of her educational expenses, not covered by her student loans, after her graduation. However, a mechanical application of the test could result in all contracts for the sale of goods and services, whether or not related to educational expenses, being found to be loans, even when that was clearly not the intention of the parties, which is the fundamental requirement under Grand Union. For that reason, we reject a mechanical application of the Merchant test which appears only to address whether there is a debt for educational expenses, something which Congress specifically declined to make nondischargeable under Section 523(a)(8).
Cazenovia has also urged this Panel to hold that even if the Reservation Agreement did not evidence the making of an educational loan at the time it was signed by the parties, the transaction became a student loan for purposes of Section 523(a)(8) when Cazenovia allowed Renshaw to attend classes without paying the required tuition, room and board in advance. As set forth above, this unilateral election by Cazenovia, which was provided for in the Reservation Agreement, merely converted the transaction from a cash sale to a credit sale, since there were no further discussions or negotiations between Cazenovia and Renshaw which could have resulted in the necessary change of intent from a transaction for the sale of goods and services to a loan transaction. Furthermore, if Cazenovia believed that somehow the transaction had gone from an agreement for the sale of goods and services to a loan, it would not have requested a usurious rate of interest, 19.2% per annum, in connection with the entry of the Cazenovia Judgement.[16]
C. Made Under a Funded Program
The Bankruptcy Court determined that Cazenovia had not met its burden to demonstrate, as required by the specific provisions of Section 523(a)(8), that the debt owed by Renshaw, if it could be found to be for an educational loan, was made as part of a funded program.
Since Section 523(a)(8) was first amended in 1979,[17] it has always specifically required that an educational loan which was not made, insured or guaranteed by a governmental unit, be "made under any program funded in whole or in part by a governmental unit or a nonprofit institution."
Although the courts which have addressed this issue have almost uniformly held that an educational loan not made, insured or guaranteed by a governmental unit must be made as a part of a "program,"[18] Cazenovia makes an interesting argument that does not appear to have been specifically addressed by another court, and which has some merit. Cazenovia contends that, since Section 523(a)(8) as originally enacted did not require that an educational loan made by an institution of higher education be made as part of a program for it to be nondischargeable,[19] and the legislative history to the 1979 Amendment, which required that such a loan be made under a funded program, indicated that "the bill would not alter the protection from discharge which the present version of 11 U.S.C. § 523(a)(8) affords to educational loans made outside the auspices of federal *560 programs by nonprofit institutions of higher education, state and local governments,"[20] section 523(a)(8) still does not require educational loans made by nonprofit institutions of higher education to be made as part of a program for them to be nondischargeable.
However appealing Cazenovia's argument may be, the fact remains that Section 523(a)(8), as amended at the time of the filing of Renshaw's petition, is unambiguous, and we do not believe that the "literal application of the statute will produce a result demonstrably at odds with the intentions of its drafters" should we hold that to be nondischargeable, an educational loan made by a nonprofit institution of higher education must be made as part of a funded program. See Santa Fe Medical Services v. Segal (In re Segal), 57 F.3d at 346 citing United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290.[21]
We agree with the Bankruptcy Court Order that Cazenovia has not met its burden to show that the debt due it from Renshaw was incurred as part of a funded program, as required by Section 523(a)(8).
D. Overview
We are invited by Cazenovia to find that virtually all obligations of a student to an educational institution are nondischargeable. We decline to do so.
V. Conclusion
For the reasons set forth above, we affirm the Bankruptcy Court decision.
BUCKI, Bankruptcy Judge dissenting.
In my view, the majority accords too narrow a definition to the words "educational loan", as used in section 523(a)(8) of the Bankruptcy Code. The standard of In re Grand Union Co., 219 F. 353 (2nd Cir.1914) has utility in distinguishing between a true sale of goods and a loan that is disguised as a sale. Such precise differentiation may be necessary in the context of agreements that are specifically designed to avoid or to achieve particularized legal consequences. In contrast, section 523(a)(8) speaks broadly to an entire class of obligations. For this reason, educational loans should include any extension of credit to finance the costs of education. When a college or university routinely extends such credit as in the present instance, the student should be deemed to have received an educational loan pursuant to a program funded by a nonprofit institution. By the language of section 523(a)(8), an order of discharge under chapter 7 does not discharge an individual debtor from such an obligation. I accept the rationale of In re Hill, 44 B.R. 645, 647 (Bankr.D.Mass.1984), which held in a similar factual context that a university's extension of credit to a student is "in fact, a loan and, therefore, falls within the exception to discharge." Although in a case involving the discharge of a student's promissory note, the Sixth Circuit has stated that it finds the reasoning of In re Hill to be persuasive. In re Merchant, 958 F.2d 738 (1992). See also, Najafi v. Cabrini College, 154 B.R. 185 (Bankr.E.D.Pa., 1993).
Whether Renshaw's obligation arises from a loan or a sale of services on credit is, in my view, a matter of little consequence. By its terms, section 523(a)(8) excepts from discharge not only educational loans, but also any debt "for an obligation to repay funds received as an educational benefit, scholarship, or stipend." In its fifth footnote, the majority dismisses this latter provision by noting that Renshaw never actually received any funds. I disagree with this interpretation. Key to an understanding of the statute is the word "as". Webster's New Collegiate Dictionary (1961 edition) defines this word, when used as a preposition, to mean "in the idea, character, condition, or capacity of." Thus, Section 523(a)(8) applies not to funds received as cash, but to funds received in the character or condition of an educational benefit. Such being precisely the source of Renshaw's obligation, his indebtedness to Cazenovia College should be deemed nondischargeable. *561 Accordingly, I would reverse the decision below, and remand for a determination of that portion of the obligation which represents an educational benefit.
NOTES
[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. and the Federal Rules of Bankruptcy Procedure, Rules 1001 et seq.
[2] Payments and credits to Renshaw's student account were described as: (1) Federal Workstudy; (2) Federal Stafford Loan; (3) Presidential Scholarship; (4) TAP Supplement/Summer; (5) NYS Tuition Assistance; (6) Federal SEDG Grant; and (7) Family contribution.
[3] This included several monthly Service Charges at the rate of 19.2% per annum.
[4] Section 523(a)(8) provides in part that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt 
(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, . . .
11 U.S.C. § 523(a)(8) (1998).
[5] At oral argument, Cazenovia conceded that, since there were no funds actually received by Renshaw, the last portion of Section 523(a)(8), which reads "or for an obligation to repay funds received as an educational benefit, scholarship or stipend," was not applicable. This is consistent with the statement in the Bankruptcy Court Order that "It is undisputed by the parties that there was no transfer of funds . . ." and the Court's factual finding, which was not clearly erroneous, that "there is no advance of funds . . ." (Order at page 11.) Based upon this concession and the Bankruptcy Court's factual finding, the requirements for nondischargeability that are set forth in the last portion of Section 523(a)(8) have not been legally satisfied.
[6] Rule 8013 provides:

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.
Federal Rules of Bankruptcy Procedure Rule 8013 (1998).
[7] Crime Control Act of 1990, Pub.L. No. 101-647, § 3631(a), 104 Stat. 4865 (1990).
[8] An "educational benefit overpayment" is an overpayment from a program such as the GI Bill where students receive periodic payments while they are enrolled in school, but if the students receive payments after they have left the school, that is an educational benefit overpayment. See In re Coole, 202 B.R. 518, 519 (Bankr.D.N.M. 1996); In re Alibatya, 178 B.R. 335, 338 (Bankr. E.D.N.Y.1995); In re Johnson, 222 B.R. 783, 786 (Bankr.E.D.Va.1998). See also, H.R.Rep. 101-736.
[9] See In re Van Ess, 186 B.R. 375, 379-380 (Bankr.D.N.J.1994), rejecting the analysis relied on by Cazenovia in In re Najafi, 154 B.R. 185. (Bankr.E.D.Pa.1993).
[10] A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows.

`In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form.' 39 Cyc. 926. Grand Union, 219 F. at 356.
[11] Black's Law Dictionary defines a credit sale as, "A sale of property accompanied by delivery of possession, but where payment of the price is deferred to a future day."
[12] The sale of goods and services are exempt from the usury laws. Unlike an entity which lends money, it is not illegal for an entity providing goods and services to a consumer to charge one price for cash and another price (original price plus a Service Charge) for a sale on credit. A Service Charge can be any amount regardless of the legal rate of interest as long as the transaction is a bona fide sale, or, viewed another way, an entity can have one price (cost plus a Service Charge) and offer a discount (cost only) for prompt payment. See e.g. Butts v. Samuel, 5 A.D.2d 1008, 174 N.Y.S.2d 325 (N.Y.App.Div. 1958); Aglio v. Carousel, 34 Misc.2d 79, 228 N.Y.S.2d 350, 352 (N.Y.Sup.Ct.1962)
[13] In In re DePasquale, 225 B.R. 830 (1st Cir. BAP) (1998), where the Panel, utilizing a different test from that required in this Circuit, found that an educational loan had been made, it noted that there were more than two years of negotiations between the student and the institution. p. 831. Even in the cases of In re Merchant, 958 F.2d (6th Cir.1992) ("Merchant"), and In re Hill, 44 B.R. 645 (Bankr.D.Mass.1984) that Cazenovia so heavily relies upon, it was clear that the institutions in question were aware of the specific financial needs of their students and were attempting to address those needs.
[14] See e.g. In re Johnson, 222 B.R. 783 (Bankr. E.D.Va.1998) (courts should construe exceptions to discharge in favor of the debtor. Advance of funds or a transfer of a "sum of money" must occur and the mere nonpayment of tuition is not an exchange of money and, therefore, not an educational loan for purposes of Section 523(a)(8)); In re Nelson, 188 B.R. 32 (D.S.D. 1995) (the university's choice to allow a debtor to continue to attend classes without signing a note or making payments cannot amount to a loan or an educational benefit overpayment); In re DePasquale, 211 B.R. 439 (Bankr.D.Mass.1997) (a loan involves more than an extension of credit, it is the furnishing of money or other property by a lender to a borrower. The mere waiving of a standard requirement that tuition be prepaid in allowing a debtor to pursue a degree without first paying tuition does not involve any advance of funds and does not constitute a loan); In re Ellenburg, 89 B.R. 258 (Bankr.N.D.Ga.1988) (an institution's claims against a student was not an educational loan which would be nondischargeable, absent evidence of an agreement where the school advanced money to the student or where the student agreed to pay the tuition upon certain terms); In re Alibatya, 178 B.R. 335 (Bankr. E.D.N.Y.1995) (unpaid student housing costs are not an "educational benefit overpayment" or "loan" protected by Section 523(a)(8)); In re VanEss, 186 B.R. 375 (Bankr.D.N.J.1994) (Section 523(a)(8) has been steadily expanded to ensure that financial assistance that is government made, insured, or guaranteed, or made under a program funded by a non-profit institution is now within the ambit of this subsection, this is completely consistent with the congressional intent to prevent abuses and protect the solvency of the educational loan program, however, by its plain language this section has not been expanded to include all financial obligations owed to educational institutions); In re Coole, 202 B.R. 518 (Bankr.D.N.M.1996) (the plain meaning of "loan" requires a sum of money to change hands which does not occur when a school provides services to the debtor. Congressional intent to prevent abuse of the student loan program cannot be used as a catch-all which overlooks the specific wording of the statute).
[15] Merchant provides a broad definition which would include almost every commercial transaction.

a loan under Section 523(a)(8) includes extensions of credit when the following factors are present: (1) the student was aware of the credit extension and acknowledges the money owed; (2) the amount owed was liquidated; and (3) the extended credit was defined as a sum of money due to a person
Merchant, 958 F.2d at 741.
[16] See Appendix for Plaintiff-Appellant, p. 39.
[17] Act of August 14, 1979, Pub.L. No. 96-56, § 3(1), 93 Stat. 387 (1979) (amending 11 U.S.C. § 523(a)(8) (Supp. 1979)).
[18] See: (1) Santa Fe Medical, 57 F.3d 342, 347 (3rd Cir.1995); In re Pilcher, 149 B.R. 595, 597 (9th Cir. BAP) (1993); and In re Van Ess, 186 B.R. 375, 378 (Bankr.D.N.J.1993).
[19] As originally enacted Section 523(a)(8) provided:

(a) A discharge under section 727, 1141, or 1326(b) of this title does not discharge an individual from any debt 
(8) to a governmental unit or a nonprofit institution of higher education, for an educational loan, unless 
(A) such loan first became due before five years before the date of the filing of the petition; or
(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the dependents of the debtor.
Collier On Bankruptcy, Append. A, Appt. Pt. 4-58 through 44-59 (15th Edition Revised 1997).
[20] See S.REP. 96-230 (1979).
[21] Effective as of October 7, 1998, Congress amended Section 523(a)(8) and retained the "program" requirement as it did in its 1979, 1984 and 1990 Amendments.