**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

m 01-10516

_____


IN THE MATTER OF:

DANIEL G. MURPHY,

Debtor.


DANIEL G. MURPHY,

Appellant,

VERSUS

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY
and
EDUCATIONAL CREDIT MANAGEMENT CORPORATION,

Appellees.


_____

Appeal from the United States District Court
for the Northern District of Texas
_____

March 5, 2002

Before SMITH and DEMOSS, Circuit Judges, and LAKE, District Judge.[*]

JERRY E. SMITH, Circuit Judge:

Daniel Murphy borrowed approximately $55,000 in federally guaranteed loans to attend institutions of higher learning. Shortly after receiving and L.L.M. degree, he filed for chapter 7 bankruptcy. The bankruptcy court held that 11 U.S.C. § 523(a)(8) bars him from discharging any of those loans in bankruptcy, because he obtained them to finance his education and signed promissory notes reflecting that purpose. The district court affirmed, and, finding no error, we also affirm.

I.

Murphy matriculated at Michigan State University in 1986 and graduated in 1990. He then attended Thomas M. Cooley Law School for three years and received his J.D. degree. In 1997, he obtained an L.L.M. from Wayne State University. He financed his education through approximately $55,000 in student loans issued under the Federal Family Education Loan Program "(FFELP)", 20 U.S.C. §§ 1071 *et seq*.

Murphy describes a uniform procedure for receiving the loans: He appeared at the financial aid office, discussed his needs, and signed a promissory note. The lender disbursed the loan to the school, which withheld tuition and expenses and gave Murphy the remainder for discretionary spending. Murphy used the money to purchase a car, housing, and food and to pay fraternity dues and other ordinary living expenses.

---

[*] District Judge of the Southern District of Texas, sitting by designation.

Education Credit Management Corporation ("ECMC") is a non-profit Minnesota corporation that provides financial assistance to students enrolled in higher education programs. ECMC holds nine promissory notes executed by Murphy.[1] As of March 15, 2000, Murphy owed ECMC $64,178.54.

Pennsylvania Higher Education Assistance Agency ("PHEAA") is a government agency organized under the laws of Pennsylvania, that provides financial assistance to students enrolled in higher education programs. PHEAA holds a promissary note dated July 5, 1996 for federal Stafford loans totaling $18,5000. The parties stipulated that Murphy spent $7,000 on tuition and related expenses and $11,500 on other living expenses; as of March 10, 2000, he owed PHEAA $22,472.40.

Murphy filed and obtained a consumer chapter 7 discharge, then filed an adversary proceeding against PHEAA and ECMC, alleging that the portion of the student loans spent on living expenses was nondischargeable. The bankruptcy court granted summary judgment in favor of PHEAA and ECMC.

II.

The Bankruptcy Code prevents former students from discharging educational loans in bankruptcy. 11 U.S.C. § 523(a)(8). Courts have divided over whether students who use a portion of their student loans for room, board, and living expenses can discharge that portion

---

[1] The notes reflect the following dates and amounts: (1) May 3, 1993, $7,500; (2) April 18, 1994, $8,500; (3) October 4, 1994, $4,500; (4) April 17, 1995, $2,834; (5) April 17, 1995, $3,334; (6) August 22, 1995, $5,666; (7) August 22, 1995, $6,666; (8) May 3, 1993, $4,000; and (9) April 18, 1994, $5,500.

of the debt in bankruptcy. Some courts have held that when the lender makes the loan available for educational purposes, no part of the loan can be discharged in bankruptcy, regardless of the actual use.[2] Other courts have held that when the student spends the money on noneducational items and services, that portion can be discharged.[3] We conclude that the text of the Bankruptcy Code, the Federal Family Education Loan Program ("FFELP"), and Murphy's promissory notes support

nondischargeability. In other words, it is the purpose, not the use, of the loan that controls. Treating FFELP guaranteed loans uniformly, regardless of actual use, is true to the text and will prevent recent graduates from reneging on manageable debts and will preserve the solvency of the student loan system.

A.

We review the bankruptcy and district court's interpretation of § 523(a)(8) *de novo*.[4] That section explains that a discharge "does not discharge an individual debtor from any debtSS"

> for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an education benefit scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8). The section exempts "educational . . . loan[s] made, insured or guaranteed by a governmental unit." The plain language suggests two limitsSSthe adjective

---

[2] *Constr. Equip. Fed. Credit Union v. Roberts (In re Roberts)*, 149 B.R. 547, 551 (C.D. Ill. 1993) (finding it unnecessary to remand to apportion loan proceeds spent on educational expenses and living expenses); *In re Pelzman*, 233 B.R. 575, 580 (Bankr. D.D.C. 1999) (finding that university's extension of credit for room and board fell within the scope of an educational loan); *Stevens Inst. of Tech. v. Joyner (In re Joyner)*, 171 B.R. 762, 764-65 (Bankr. E.D. Pa. 1994) (finding that room, board, and other living expenses serve an educational purpose and refusing to find that portion dischargeable); *United States Dep't of Health and Human Servs. v. Vretis (In re Vretis)*, 56 B.R. 156, 157 (Bankr. M.D. Fla. 1985) (finding that stipend that provided for rent and living expenses was not dischargeable).

[3] *Ealy v. First Nat'l Bank (In re Ealy)*, 78 B.R. 897, 898 (Bankr. C.D. Ill. 1987) (finding portion of loan that student used to purchase truck, pay off wife's car, and pay for other miscellaneous expenses dischargeable in bankruptcy); *United States Dep't of Health & Human Servs. v. Brown (In re Brown)*, 59 B.R. 40, 43 (Bankr. W.D. La. 1986) (instructing government to separate portion of stipend spent on tuition and books from portion spent on rent and living expenses); *Dep't of Mental Health, State of Missouri v. Shipman (In re Shipman)*, 33 B.R. 80, 82 (Bankr. W.D. Mo. 1983) (discharging stipend partially because the debtor spent the proceeds on rent and living expenses).

[4] We review a bankruptcy court's legal conclusions *de novo*. *Texas Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998). Summary judgment decisions and statutory interpretation questions are legal findings that we review *de novo*. *Samson v. Apollo Resources, Inc.*, 242 F.2d 629, 633 (5th Cir.) (statutory interpretation), *cert. denied*, 122 S. Ct. 63 (2001); *Herman v. Holiday*, 238 F.3d 660, 663 (5th Cir. 2001) (summary judgment).

"educational" and the requirement that a governmental or nonprofit body make or guarantee the loan.

At first cut, PHEEA's and ECMC's loans satisfy these two limits. PHEEA and ECMC made the loans to Murphy pursuant to a federal statute that provides for educational loans; the government also insured the loans against Murphy's default.

Murphy insists, however, that we should read another limit into § 523(a)(8). He contends that students may discharge the portion of their educational loans not spent or tuition or books. He points to cases holding that "[t]he test for determining whether a loan is a student loan is whether the proceeds of the loan were used for 'educational purposes.'" *E.g.*, *In re Ealy*, 78 B.R. at 898 (citations omitted). None of these cases considers a loan made pursuant to a federal student loan statute, but Murphy would have us extend their reasoning. He variously argues that the word "educational" or phrase "educational benefit" permits students to discharge the portion of student loan proceeds spent on living or social expenses.

The textual hook for Murphy's argument is puzzling; he reads too much into the adjective "educational." Section 523(a)(8) does not expressly state that only loans "used for tuition" are nondischargeable. Nor does it define educational loans as excluding living or social expenses. *Barth v. Wis. Higher Educ. Corp. (In re Barth)*, 86 B.R. 146, 148 (Bankr. W.D. Wis. 1988) ("The language of section 523(a)(8) does not refer to whether the debtor or anyone else derived educational benefits."). Loans for room and board facilitate an education and meet expenses incidental to

attending school full-time.[5]

In the alternative, Murphy argues that the phrase "educational benefit" modifies both overpayment and loan. He infers that the resulting phrase "educational benefit loan" requires not only that the lender intend that the funds go towards educational purposes but also that the borrower spend the funds on tuition or books. For three reasons, Murphy's interpretation is strained, at best.

First, the word "educational," rather than "educational benefit," modifies "loan." When Congress amended § 523(a)(8) in 1990, it replaced "educational loan" with "educational benefit overpayment or loan."[6] Courts have interpreted the phrase "educational benefit overpayment" to include a category of governmental programs that pay students for the anticipated cost of future tuition.[7] After

_____

[5] *In re Pelzman*, 233 B.R. at 580; *In re Joyner,* 171 B.R. at 764-65.

[6] Before the 1990 amendments, § 523(a)(8) excluded from discharge "an educational loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution." 11 U.S.C. § 523(a)(8) (1988). To expand § 523(a)(8)'s scope, the 1990 amendments added the categories of (1) overpaying a grant and (2) scholarship funds or stipends. Crime Control Act of 1990, Pub. L. No. 101-647, § 3621(a), 104 Stat. 4964, 4964-65 (1990). *See Santa Fe Med. Servs., Inc. v. Segal (In re Segal)*, 57 F.3d 342, 348-49 (3d Cir. 1995).

[7] "An 'educational benefit overpayment' is an overpayment from a program such as the GI Bill under which where students receive periodic payments while they are enrolled in school, but if the students receive payments after they have left

(continued...)

4

the 1990 amendments, courts continued to examine loans to determine whether they were "educational loans";[8] no court has suggested that the word "benefit" should reduce the scope of covered loans.

Additionally, § 523(a)(8)'s second use of the word "educational benefit" before "stipend" creates a serious problem for Murphy's interpretation. The section employs a parallel structure when describing another type of nondischargeable debt as arising from "an education benefit scholarship or stipend."

"Stipend" is defined in part as "a regular allowance paid to defray living expenses; *esp.* a sum paid to a student under the terms of a fellowship or scholarship." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 2245

(Merriam-Webster 3d ed. 1986).[9] If "educational benefit" modifies both "scholarship" and "stipend," then Murphy's interpretation of the phrase "educational benefit" would eliminate a core meaning of the word "stipend." If the second "educational benefit" modifies only the word "scholarship" and not the word "stipend," then it is difficult to understand why the second invocation of "educational benefit" should have more limited scope than does the first.

In other words, why would Congress have placed the phrase "educational benefit" before two separate series of items in the same paragraph and intended for it to modify different elements in each series? The inclusion of the word stipend proves either that "educational benefit" includes living expenses or that it describes only the type of overpayment and not the type of loan.

Finally, even if we were to interpret § 523(a)(8) to require an "educational benefit loan," Murphy does not explain why that phrase requires us to look to use rather than purpose. All Stafford loans are intended to convey educational benefits, and a grant of living expenses enables a student to attend school full-time, which certainly has educational benefits. We now turn to the FFELP to examine the unique features of loans made pursuant to that federal statute.

---

[7] (...continued) the school, that is an educational benefit overpayment." *College of Saint Rose v. Regner (In re Renshaw)*, 229 B.R. 552, 556 & n.7 (BAP 2d Cir. 1999), *aff'd*, 222 F.3d 82 (2d Cir. 2000). *New Mexico Inst. of Mining and Tech. v. Coole (In re Coole)*, 202 B.R. 518, 519 (Bankr. D.N.M. 1996); *Alibatya v. New York Univ. (In re Alibatya)*, 178 B.R. 335, 338 (Bankr. E.D.N.Y. 1995); *Johnson v. Va. Commonwealth Univ. (In re Johnson)*, 222 B.R. 783, 786 (Bankr. E.D. Va. 1998).

[8] *E.g., In re Renshaw*, 229 B.R. at 559-60 (characterizing question as whether debtor received an "educational loan" and not an "educational benefit loan"); *Shaffer v. United Student Aid Funds (In re Shaffer)*, 237 B.R. 617, 618 (Bankr. N.D. Tex. 1999) (same); *In re Pelzman*, 233 B.R. at 576-77 (same); *In re Alibatya*, 178 B.R. at 338 ("The term 'educational' is merely an adjective describing 'loan.'").

[9] Other dictionaries contain even broader definitions of "stipend." BLACK'S LAW DICTIONARY at 1426 (West Deluxe 7th ed. 1999) ("A salary or other regular, periodic payment."); XVI OXFORD ENGLISH DICTIONARY 713 (Oxford 2d ed. 1989) ("A fixed periodical payment of any kind, e.g. a pension or allowance . . . . Also . . . *to keep in stipend*, to defray the maintenance of.").

### B.

The FFELP includes living expenses in its loans to full-time students for educational purposes. First, the FFELP contemplates that students can use federal loans to finance a full-time education. The statute distinguishes between students who take heavier course loads and those who take lighter loads.[10] Permitting students to take out loans for living expenses enables them to attend school full time.

Second, the FFELP calculates the "costs of attendance" by including allowances for "room and board," 20 U.S.C. § 1097*ll*(3), "miscellaneous personal expenses," 20 U.S.C. § 1087*ll*(2), and child care, 20 U.S.C. § 1087*ll*(8). The FFELP's need analysis assumes that loans must cover a full-time student's living expenses so that he has the time and energy to study and attend classes.

Murphy argues that the Bankruptcy Code and not the FFELP should define dischargeable and nondischargeable loans. First, § 523(a)(8) has a direct link to the Higher Educational Act, because Congress originally included it in the educational act and only later moved it to the Bankruptcy Code. *In re Shipman*, 33 B.R. at 82. Second, we should attempt to give horizontal coherence to the United States Code and ensure that different statutes interact coherently and harmoniously.[11] If Congress defined living expense allowances as serving an educational purpose in the student loan statutes, we should assume it also interpreted those living expense allowances as having an educational purpose in the Bankruptcy Code.

The evidence in this particular case confirms that Murphy borrowed money for living expenses as part of his broader effort to obtain an education. In the promissory notes, he acknowledged that he was borrowing the money for educational purposes.[12] He later

---

[10] As an initial condition for insurance eligibility, a student must take half of the courses necessary for full-time enrollment. 20 U.S.C. § 1077(a). The need analysis then includes larger living expense allowances for full-time students and smaller living expense allowances for part-time or correspondence students. 20 U.S.C. § 1087*ll*(4) (withholding room and board and personal expenses from less than half-time students); 20 U.S.C. § 1087*ll* (limiting the room and board costs of correspondence students to any necessary residential training).

[11] *E.g.*, *Pierce v. Underwood*, 487 U.S. 552, 561-63 (1988) (interpreting phrase "justified to a high degree" in the Equal Access to Justice Act as having the same meaning as the same phrase contained in other statutes and the Federal Rules of Civil Procedure); *Lorillard v. Pons*, 434 U.S. 575, 584 (1978) (looking to judicial interpretation of identical terms in other statutes).

[12] The PHEAA note provides that the loans were (1) issued under the Federal Stafford Loan Program and (2) governed by the Higher Education Act of 1965, 20 U.S.C. § 1070. Murphy represented on the borrower certification of the note that (1) he must return all loan proceeds not reasonably attributed to educational expenses for the cost of attendance on at least a half-time basis; and (2) the total amount of loans received under the note would not exceed his maximum eligibility under the Higher Education Act of 1965. The amount of the PHEAA loans corresponded exactly to the "cost of attendance" certified by Wayne State University on the note.

The ECMC note also included a "borrower certification" that Murphy would "immediately repay any loan proceeds that cannot reasonably be attributed to educational expenses for attendance on at least a half-time basis at the certifying (continued...)

6

testified that he borrowed the funds to support his full-time attendance. When a federal student loan statute authorizes the loan, the student signs an agreement to spend the funds on educational expenses, and the government guarantees the loan, then the loan should be nondischargeable.

## C.

Permitting students to discharge student loans in bankruptcy because the student spent the money on social uses, alcohol, or even drugs would create an absurd result. Students who used the loan proceeds to finance an education would retain the burden of paying them even after a chapter 7 discharge; irresponsible students who abused the loans would gain the benefits of discharge. Courts have emphasized two purposes when analyzing § 523(a)(8): (1) preventing undeserving debtors from abusing educational loan programs by declaring bankruptcy immediately after graduating;[13] and (2) preserving the financial integrity of the loan system.[14] Murphy's interpretation would create two perverse effects: (1) Dischargeability would reward irresponsible student borrowers and punish responsible borrowers; and (2) the federal government would have to pay out more to cover the costs of defaulting students' loans. Murphy's interpretation would create the type of absurd result that even rigid textualists seek to avoid.[15]

Murphy argues that private lenders currently receive the benefit of governmental guarantees on these loans, so these lenders have an incentive to expand the scope of "educational loans." Perhaps. If so, then the government has the judicial remedy of suing private lenders directly and the legislative remedy of redefining the needs analysis of the FFELP.

The potential windfalls of private lenders do not provide a persuasive reason for us to rewrite § 523(a)(8). Doing so would affect the private lenders only indirectly, because the governmental insurers, rather than private lenders, would bear the burden of the loss. This remedy also would create perverse incentives for student borrowers, squarely at odds with the only purposes that Congress has

---

[12](...continued)
school."

[13] *In re Segal*, 57 F.3d at 348-49 (acknowledging that § 523(a)(8) was enacted to "remedy abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing for bankruptcy shortly after graduation"); *Andrews Univ. v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6th Cir. 1992) (citing a House report and floor statement by Senator DeConcini).

[14] *In re Renshaw*, 222 F.3d at 86-87 ("Congress enacted § 523(a)(8) because there was evidence of an increasing abuse of the bankruptcy process that threatened the viability of educational loan programs and harm to future students as well as (continued...)

[14](...continued)
taxpayers."); *In re Alibatya*, 178 B.R. at 340 (citing a Senate Report, House Report, and Senator DeConcini's statement).

[15] *E.g.*, *Green v. Bock Laundry*, 490 U.S. 504, 527 (1999) (Scalia, J., concurring) ("I think it entirely appropriate to consult all public materials, including the background of Rule 609(a)(1) and the legislative history of its adoption, to verify that what seems to us an unthinkable disposition . . . was indeed unthought of, and thus to justify a departure from the ordinary meaning of the word 'defendant.'").

ascribed to the FFELP.

Because the bankruptcy and district courts' interpretation of § 523(a)(8) best comports with the text of the Bankruptcy Code and FFELP, the judgment is AFFIRMED.