**In re Donald E. NIES, Debtor.**

**Tift County Hospital Authority d/b/a Tift Regional Medical Center f/k/a Tift General Hospital, Plaintiff,**

**v.**

**Donald E. Nies, Defendant.**

**Bankruptcy No. 02–18340–JNF.
Adversary No. 03–1060.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 20, 2005.

Edward J. Neville, III, Mauser and Mauser, Boston, MA, for Debtor.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court is the Motion for Summary Judgment filed by Tift County Hospital Authority d/b/a Tift Regional Medical Center f/k/a Tift General Hospital (the "Hospital" or "Tift County Hospital") through which it seeks a judgment that a debt owed to it by Dr. Donald E. Nies ( "Dr. Nies" or the "Debtor") is a nondischargeable consolidated student loan under 11 U.S.C. § 523(a)(8). The Debtor opposed the Motion.

Tift County Hospital filed an adversary proceeding against Dr. Nies on February 14, 2003. The Debtor answered the Hospital's Complaint, denying that advances made to him by the Hospital qualify as an "educational benefit overpayment or loan

made, insured, or guaranteed by a governmental unit" within the meaning of § 523(a)(8).

On January 18, 2005 the Hospital filed its Motion for Summary Judgment with supporting exhibits under Local Bankruptcy Rule 7056–1 and District Court Local Rule 56.1. The Hospital also filed a Memorandum of Law in support of its Motion, as well as two Affidavits: one by Greg Pilgrim, President of Southeast Physician Search, and the other by William Richardson, Chief Executive Officer of the Tift County Hospital Authority. On March 15, 2005, Dr. Nies filed an Affidavit in opposition to the Motion for Summary Judgment, accompanied by a Memorandum of Law.

The Court heard the Hospital's Motion on Summary Judgment on June 15, 2005, and took the matter under advisement. The Court also granted the Debtor an opportunity to file a supplemental memorandum in opposition to the Hospital's Motion for Summary Judgment.

The issue presented is whether Tift County Hospital made an educational loan to the Dr. Nies so that its debt is excepted from discharge in his Chapter 7 case. For the reasons set forth below, this Court finds that, although there are no material facts in dispute, Tift County Hospital is not entitled to summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1995, Dr. Nies graduated from the University of Michigan Medical School. After graduation, Dr. Nies became a licensed medical practitioner in the Commonwealth of Massachusetts and the State of Georgia.

Tift County Hospital is a non-profit, tax-exempt corporation created under the Georgia Hospital Authorities Law. The Hospital is located in a "rural" area as defined by 42 U.S.C. § 1395WW(D)(ii), as well as in an area designated as a Health Professional Shortage Area by the United States Department of Health and Human Services under 42 U.S.C. §§ 216, 254e.

In order to address the health and medical needs of residents in Tift County, the Hospital implemented a Physician Recruitment Program (the "PRP") in 1995. The purpose of the PRP was to attract recent medical school graduates to Tift County. Since 1995, the Hospital, through the PRP, has been able to recruit over 45 physicians to Tift County, and the PRP has served as a critical tool to bring needed medical services to the region.

The PRP provides recruited physicians with the opportunity to receive loans up to $75,000 to repay their student loans. Under the PRP, any loan granted to a physician is forgiven, if the physician maintains a practice in Tift County over an agreed period of time. The Hospital, through the PRP, used this recruitment tool to compete with other programs across the country.

Early in 1999, the Hospital retained Greg Pilgrim, president of Southeast Physician Search, to conduct a direct mail campaign to locate and recruit a qualified radiologist under the PRP. The direct mail campaign he coordinated offered physicians "$75,000 in Student Loan Repayment" for relocating their practice to Tift County. In response to the Hospital's direct mail campaign, Dr. Nies submitted his *curriculum vitae* and other medical credentials for the Hospital's consideration on or about March 29, 1999.

Between March and September of 1999, the Hospital's radiology group reviewed Dr. Nies' credentials, and on September 27, 1999, Dr. Nies entered into an agreement (the "Agreement") with the Hospital to relocate to Tift County. The "purpose"

of the Agreement was set forth in Article 9 as follows:

> *Participation of Hospital:* The parties acknowledge that the participation of the Hospital under this Agreement is *in furtherance of its purpose of providing medical care to the public* in medical fields that have been determined by the Hospital to present a need that is not currently being serviced (or is currently under-serviced) in the community.

(Emphasis supplied).

The Agreement did not purport to be an employment contract between Dr. Nies and the Hospital. Instead, the Agreement recited that Dr. Nies would be an independent contractor, and the Hospital would not have any control over the medical services he provided in the community. While it contained a provision requiring Dr. Nies to acquire staff privileges at Tift County Hospital, it did not prohibit him from acquiring staff privileges with entities other than the Hospital.

In consideration for relocating to Georgia, the Hospital agreed to provide Dr. Nies with a $75,000 loan. At the time, Dr. Nies's student loans exceeded $75,000. The specific language of the Agreement pertaining to Dr. Nies's student loans provided the following:

> 2. *Loan:* Upon commencement of Physician's practice pursuant to Section I above, the Hospital agrees to loan Seventy-five Thousand Dollars ($75,000.00) to the Physician to repay his/her documented student loans. The Physician agrees to repay this amount with interest in four (4) equal and consecutive payments, the first payment being due twelve (12) months from the date of the loan, pursuant to that certain Promissory Note executed by the Physician simultaneously with this Agreement.

Thus, by the terms of the Agreement, Dr. Nies was required to repay the loan over four years in annual installments. If Dr. Nies maintained a full-time medical practice in Tift County, during the 12 months preceding an annual payment, the Hospital agreed to forgive that annual payment. If he performed medical services for 48 consecutive months, the entire principal of the $75,000 loan would be forgiven. If he defaulted or terminated the Agreement by moving his practice from Tift County, the entire principal of the loan would be become due and payable on demand.

On the same day Dr. Nies executed the Agreement, he executed a Promissory Not which referenced the Agreement, and the Hospital issued a check to him in the amount of $75,000. In his Affidavit, Dr. Nies stated that the Hospital issued the check directly to him and took no steps to monitor how the funds were used. Indeed, Dr. Nies stated that his wife, who managed the couple's finances, used the proceeds of the loan to repay some of his student loans, to repay some of her student loans, and to purchase furniture for their new home in Georgia. Dr. Nies added that he was aware of one physician who used loan proceeds for a down payment on a home.

Following his move to Tift County, Dr. Nies practiced medicine there for a number of months. In May, 2001, however, he obtained a radiology fellowship in Chicago and moved to Illinois. As a result, he failed to complete a full year of medical services in Tift County.

On August 7, 2002, the Hospital served Dr. Nies with notice of default, and, on the next day, commenced a civil action in a Georgia state court to collect the amount due under the Promissory Note.

On November 18, 2002, Dr. Nies and his wife, Terri Nies, filed a joint voluntary petition under Chapter 7 of the Bankrupt-

cy Code in the District of Massachusetts. On Schedule F—Creditors Holding Unsecured Nonpriority Claims, they listed claims totaling approximately $180,000, including the claim of Tift County Hospital in the amount of $90,003.39. On Schedule E—Creditors Hold Unsecured Priority Claims, they listed various student loans owed to "ACS" totaling approximately $92,000.

On August 14, 2003, this Court entered an order discharging the Debtor and his spouse from all dischargeable debts. The only outstanding issue in the Debtors' Chapter 7 case is whether the Dr. Nies's obligation to the Hospital is excepted from discharge under 11 U.S.C. § 523(a)(8).

## III. POSITIONS OF THE PARTIES

### A. *Tift County Hospital*

In its Memorandum, the Hospital argues that the initial educational character of the loans determines whether a consolidation loan is excepted from discharge. Citing, *inter alia, United Student Aid Funds v. Flint (In re Flint)*, 238 B.R. 676, 680–81 (E.D.Mich.1999), *Lapusan v. Ed. Credit Mgmt. Corp. (In re Lapusan)*, 244 B.R. 423, 425 (Bankr.S.D.Ill.2000), and *Cobb v. United Student Aid Funds, Inc. (In re Cobb)*, 196 B.R. 34, 38 (Bankr.E.D.Va. 1996), it further argues that "[t]he consolidation loan served to pay off and alter the terms of the initial education loan and thus created a new obligation relative to the reasons for the debt." It adds that the "purpose and characterization of the loan, agreed upon by both parties as evidenced by their signatures on the Agreement, justifies the applicability of § 523(a)(8) to the loan at issue in this case."

Relying upon *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921 (1st Cir.1995), as well as *In re Flint*, the Hospital also argues that an educational benefit need not be received in order for a consolidation loan of outstanding educational loans to qualify as a nondischargeable debt under § 523(a)(8). In its words, "[a]s long as the loans being consolidated provided an educational benefit for either debtor or his or her family, the consolidation loan still qualifies for the protection of § 523(a)(8)."

The Hospital also maintains that the terms of its loan "closely resemble the terms of other loans found to be consolidations of education loans." In its Memorandum, it suggests that nothing changed about the nature of the debt upon consolidation except that the Debtor received better payment terms. The Hospital adds that public policy supports protection of lenders, such as itself; that the consolidation loan was issued pursuant to a loan program as required by case law; and, finally, citing, *inter alia, Burks v. Louisiana (In re Burks)*, 244 F.3d 1245, 1246–47 (11th Cir.2001), and *U.S. Dep't of Health and Human Servs. v. Smith*, 807 F.2d 122 (8th Cir.1986), that the service component of the loan and its timing do not disqualify it from § 523(a)(8) protection. In other words, it maintains that "the fact that Dr. Nies had completed his foundational four years of medical school ... does not disqualify the loan as an educational consolidation loan under § 523(a)(8)."

### B. *Dr. Nies*

Dr. Nies, in his Memorandum and Supplemental Memorandum in Opposition to the Plaintiff's Motion, requests that the Court recognize that the Hospital is not a proper student loan creditor for the purpose of § 523(a)(8) because it did not enter into an agreement to consolidate or refinance the Debtor's private, federal, and institutional medical school loans. Instead, according to the Debtor, the Hospital issued the loan as an incentive to induce him to relocate to Tift County and to practice medicine there. Although Dr.

Nies recognizes that he was never an employee of the Hospital, he characterizes the transaction as analogous to an employee benefit, as opposed to a consolidation loan, relying upon *Resurrection Medical Center v. Lakemaker (In re Lakemaker)*, 241 B.R. 577, 580 (Bankr.N.D.Ill.1999), *Community Memorial Hospital v. Gordon (In re Gordon)*, 231 B.R. 459, 463–64 (Bankr.D.Conn.1999), and *A.L. Lee Memorial Hospital v. McFadyen (In re McFadyen)*, 192 B.R. 328, 331 (Bankr.N.D.N.Y. 1995).

Dr. Nies also argues that the Hospital's loan pursuant to the PRP was substantially different in substance and in purpose than the consolidation loans offered by other institutions or governmental entities which guarantee loans so that the debt would be excepted from discharge. He asserts that he will be able prove, at an evidentiary hearing, that the Hospital's loan administrative practices are consistent with furthering a business, not an educational, purpose and that the Hospital never assumed any obligations to the Debtor's underlying student loan creditors.

## IV. DISCUSSION

### A. *Summary Judgment Standard*

Summary Judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts" and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c), made applicable to the proceeding by Fed. R. Bankr.P. 7056; *see also Tavares v. Sprunk (In re Tavares)*, 298 B.R. 195, 201 (Bankr.D.Mass.2003).

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Cowell v. Hale (In re Hale)*, 289 B.R. 788, 791 (1st Cir.

BAP 2003)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). "Creating a genuine issue of material fact requires hard proof rather than spongy rhetoric." *Hale*, 289 B.R. at 792 (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)).

### B. *Education Loans Under 11 U.S.C. § 523(a)(8)*

Although the purpose of the Bankruptcy Code is to guarantee honest debtors a "fresh start" through the bankruptcy discharge, *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), Congress legislated under § 523(a)(8) that "any educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution" is excepted from discharge, unless the debtor can establish "undue hardship." *See* 11 U.S.C. § 523(a)(8); *see also In re Pelkowski*, 990 F.2d 737, 739 (3rd Cir.1993)(holding that § 523(a)(8) may apply to non-student, comakers of educational loans). Moreover, Congress has amended § 523(a)(8) a number of times. As the court noted in *In re Flint*, 238 B.R. 676 (E.D.Mich.1999),

> Section 523(a)(8) was amended in 1990 to increase by two years, from five to seven years, the time period before which a student loan is nondischargeable. *See* 11 U.S.C. § 523(a)(8)(A); Pub.L. No. 101–647 (1990). Section 523(a)(8) was again amended in 1998 to eliminate the seven year rule in all cases filed after October 7, 1998. *See* 11 U.S.C. § 523(a)(8) (Supp.1999); Higher Education Amendments of 1998, Pub.L. No. 105–244, Title IX, § 971(a), 112 Stat. 1581, 1837 (1998). At present, the only

exception to nondischargeability is undue hardship.

*Id.* at 679 (citation omitted).

 Today, for a debt to be nondischargeable under § 523(a)(8), the creditor must demonstrate by a preponderance of the evidence that the loan in question "(1) . . . was an educational loan, (2) made as part of a program, and (3) by a nonprofit institution." *In re McFadyen,* 192 B.R. at 331. The sole issue in the instant case is whether the Hospital made an education loan to the Debtor, as both the second and the third prongs of the *McFadyen* test are undisputed. Thus, whether the Hospital's judgment is excepted from discharge depends on whether the purpose of its loan was educational.

Because the Bankruptcy Code does not define "educational" loan, courts have turned to the rich legislative history of § 523(a)(8) for guidance. "Educational loans are different from most loans. They are made without business considerations, without security, without cosigners, and relying for repayment solely on the debtor's future increased income resulting from the education." H.R.Rep. No. 595, 95th Cong., 2d Sess. 133, reprinted in 1978 U.S.Code Cong. & Ad. News 5963, 6094. In *Dep't of Mental Health, State of Missouri v. Shipman (In re Shipman),* 33 B.R. 80, 82 (Bankr.W.D.Mo.1983), the court explained the background and purpose of § 523(a)(8), which it used as a

rationale for concluding that the loan in question was not "educational." It stated:

> Under the Bankruptcy Act, educational loans were dischargeable resulting in millions of dollars in federally guaranteed loans defaulted upon annually. To correct this situation, section 439A(a) of the Higher Educational Act of 1965 was amended to provide that these loans were nondischargeable in a bankruptcy proceeding. When the Bankruptcy Act was reformed in 1978, this exception to discharge for educational loans was removed from the Higher Educational Act and placed in section 523 of the Bankruptcy Code. See, 4 Collier on Bankruptcy, 523.18 at 523–136–138 (15th Ed.1983).

*Id.* at 82. The court thus concluded that "[t]his direct link to the federal education statute is an excellent indication that the central issue in determining dischargeability is whether the funds were for educational purposes, not whether the funds constituted a loan." *Id.*

 A majority of courts has adopted a test that determines the educational nature of the loan by focusing on the substance of the transaction which resulted in the obligation. *See DePasquale v. Boston Univ. School of Dentistry (In re DePasquale),* 225 B.R. 830, 832 (1st Cir. BAP 1998) (citing *Johnson v. Missouri Baptist College (In re Johnson),* 218 B.R. 449 (8th Cir. BAP 1998));[1] *see also Smith,* 807

---

1. In *DePasquale,* a case in which the issue was whether an actual loan was made, when no funds, as such, were advanced, the court stated:

> A formulaic approach to the definition of loan for purposes of § 523(a)(8) should not hold sway against an approach that focuses on the substance of the transaction that created the obligation in question. In a case with facts very similar to our own, the Bankruptcy Appellate Panel for the Eighth Circuit concluded that, by extending credit

to a student for tuition and books, a college had extended a "loan" within the meaning of 11 U.S.C. § 523(a)(8), even though no money changed hands. *See Johnson v. Missouri Baptist College (In re Johnson),* 218 B.R. 449, 455 (8th Cir. BAP 1998), aff'g, 215 B.R. 750 (Bankr.E.D.Mo.1997); *see also Andrews Univ. v. Merchant (In re Merchant),* 958 F.2d 738, 741 (6th Cir.1992) (extension of credit may be a loan within meaning of § 523(a)(8) if: "1) the student was aware of the credit extension and ac-

F.2d at 124. The "substance of the transaction test" reflects recognition of the congressional purpose of § 523(a)(8), namely to ensure the availability of educational financing. This goal is achieved by "principally protect[ing] government entities and non-profits—*places which lend money or guarantee loans to individuals for educational purposes*—from bankruptcy discharge." *DelBonis*, 72 F.3d at 937 (citing *Santa Fe Medical Services v. Segal (In re Segal)*, 57 F.3d 342, 348 (3d Cir.1995))(emphasis supplied).[2]

According to the Fifth Circuit in *Murphy v. Penn. Higher Ed. Assist. Agency (In re Murphy)*, 282 F.3d 868 (5th Cir. 2002), the use of the funds by a debtor is not determinative of whether of whether the loan is educational. The Fifth Circuit stated:

> knowledges the money owed; 2) the amount owed was liquidated; and 3) the extended credit was defined as a 'sum of money due to a person.' "); *Smith*, 807 F.2d 122 (a grant awarded on the condition that a debtor practice medicine in a "physician shortage area" constitutes an educational loan); *Missouri Baptist College v. Johnson (In re Johnson)*, 215 B.R. 750, 752 (Bankr.E.D.Mo.1997) (requiring that a sum of money be advanced to a borrower "is too narrow [of an approach] and improperly focuses on the form of the transaction ... rather than by focusing properly on the substance of the transaction. The correct analysis ... asks whether the creditor extended credit to the Debtor (for educational purposes) and whether the Debtor promised to repay the amount of credit advanced. Whether a creditor actually disbursed cash to the debtor is irrelevant to the substance of the transaction"); *Najafi v. Cabrini College (In re Najafi)*, 154 B.R. 185 (Bankr.E.D.Pa.1993) (student who attended university without prepaying tuition received a nondischargeable loan); *United States Dep't of Health and Human Servs. v. Avila (In re Avila)*, 53 B.R. 933 (Bankr. W.D.N.Y.1985)(loan may exist regardless of the form of the transaction); *In re Hill*, 44 B.R. 645 (university's grant of short-term

Section 523(a)(8) does not expressly state that only loans "used for tuition" are nondischargeable. Nor does it define educational loans as excluding living or social expenses. *Barth v. Wis. Higher Educ. Corp. (In re Barth)*, 86 B.R. 146, 148 (Bankr.W.D.Wis.1988) ("The language of section 523(a)(8) does not refer to whether the debtor or anyone else derived educational benefits.").

*Id.* at 871. It added:

> [p]ermitting students to discharge student loans in bankruptcy because the student spent the money on social uses, alcohol, or even drugs would create an absurd result. Students who used the loan proceeds to finance an education would retain the burden of paying them even after a chapter 7 discharge; irresponsible students who abused the loans

> credit to student awaiting receipt of student loan was a nondischargeable loan).

*In re DePasquale*, 225 B.R. at 832–33 (footnote omitted).

**2.** In *Segal*, the court stated:

> The "purpose" here was not to facilitate Dr. Crowe's education, which had long since been completed; instead, and this is undisputed, the purpose of the funds was to induce Dr. Crowe to accept employment with Santa Fe by providing her with a means to repay her obligation to the NHSC, an obligation which arose as a result of a scholarship. That said, however, Santa Fe asks us to go further. It contends that in addition to determining the purpose of the loan, we must determine the nature and character of the debt. Here, Santa Fe relies on *Pelkowski*, wherein we noted that "the focus of section 523(a)(8) is on the nature and character of the loan, not how the recipient actually spent the money." ... We believe the record amply supports the bankruptcy court's finding that the loan made by Santa Fe to Dr. Crowe had the nature and character of a buyout. It was made solely for the purpose of securing her services and, as such, cannot be fairly characterized as an educational loan or benefit.

57 F.3d at 349.

would gain the benefits of discharge. Courts have emphasized two purposes when analyzing § 523(a)(8): (1) preventing undeserving debtors from abusing educational loan programs by declaring bankruptcy immediately after graduating; and (2) preserving the financial integrity of the loan system. Murphy's [the debtor] interpretation would create two perverse effects: (1) Dischargeability would reward irresponsible student borrowers and punish responsible borrowers; and (2) the federal government would have to pay out more to cover the costs of defaulting students' loans. Murphy's interpretation would create the type of absurd result that even rigid textualists seek to avoid.

*Id.* at 873 (footnotes omitted).

The Bankruptcy Code also does not address what constitutes a consolidated loan. In *Flint,* the court, in determining the dischargeability of a consolidated loan, observed that "[t]he majority of cases discussing § 523(a)(8) concern [sic] the time from which the seven years (or in earlier cases, five years) begins to run. Courts have roundly agreed that the act of consolidating student loans *creates a new loan which pays off the original loans* and begins the seven year clock anew." 238 B.R. at 678 (citing *Rudnicki v. Southern College of Optometry (In re Rudnicki),* 228 B.R. 179, 181 (6th Cir. BAP 1999))(emphasis supplied). For example, in *Hiatt v. Indiana State Student Assistance Comm.,* 36 F.3d 21 (7th Cir.1994), the debtor consolidated his student loans with the Indiana State Student Assistance Commission and the proceeds from the new consolidated loan were used to repay in full Hiatt's original educational loans. Indeed, the court noted that when a borrower undertakes a consolidation loan, the original loan is repaid in full and the debt is discharged. At a time when the dischargeability of student loans depended upon the date the loan became due, the debtor contended that the date on which the nondischargeability period commenced was the date on which the educational loan originally became due, regardless of the date on which a subsequent consolidation loan first became due. The court rejected the debtor's argument.

In *In re Gordon,* 231 B.R. 459 (Bankr. D.Conn.1999), the court addressed the issue of whether Community Memorial Hospital's loan to the debtor constituted an educational obligation within the scope of § 523(a)(8). It examined the status of the debtor at the time he entered into an agreement with the hospital, as well as the purpose or nature of the loan. It stated:

> At the time the loan was made the Defendant had completed medical school. In fact, the Agreement, entitled the "Physician Recruitment Agreement", recognized him as a physician, referred to him throughout as such, and is signed "Stephen W. Gordon, M.D." These facts alone cast significant doubt on the alleged "educational" nature of the loans.

231 B.R. at 464. In a footnote, however, the court observed:

> The fact that the Defendant had already completed medical school does not, by itself, disqualify the subject debt from consideration under § 523(a)(8). At least one court has stated that § 523(a)(8) is not "limited to obligations pertaining to education received at institutions of higher or post-secondary education." *Plumbers Joint Apprenticeship and Journeyman Training Committee v. Rosen (In re Rosen),* 179 B.R. 935, 938 (Bankr.D.Or.1995) (finding an educational obligation existed where loan was made to debtor enrolled in an apprenticeship training program). However, in light of Congress' intent and the type of debt sought to be pro-

tected by the provision, the loan must have been made in the context of an educational program from which the debtor derived some educational benefit. *Id.* And in this case, the Plaintiff, as determined hereafter, was simply seeking to employ the Defendant.

*Id.* at 464, n. 8.

The court in *Gordon* concluded the following:

> Every facet of the relationship between the parties was contractual and each act that either party was obligated to perform, including the advancement of the funds, was directed at one objective: to address the perceived "severe shortage" of family practice physicians in Oconto Falls. The offer of financial assistance was a calculated necessity in achieving that purpose. The funds were not loaned or used as a means to obtain an education but served as a vehicle for securing the services of a physician. The loans were "inextricably tied to the [Defendant's] employment with the Plaintiff." *A.L. Lee Memorial Hospital v. McFadyen (In re McFadyen)*, 192 B.R. 328, 332 (Bankr.N.D.N.Y.1995). It was this type of business purpose that Congress recognized was distinctive from the kind of loans § 523(a)(8) was intended to protect. Even when viewed in the light most favorable to the Plaintiff, the loans cannot be characterized as "educational" obligations under § 523(a)(8). Accordingly, the First

Count of the Complaint must be dismissed.

*Id.* at 465.

Courts, in cases such as *In re Gordon*, 231 B.R. at 464, and *In re Lakemaker*, 241 B.R. at 580, have identified several hallmarks to establish a creditor's intent to further a business purpose, as opposed to an educational purpose. These hallmarks include recruitment enticements,[3] and employee benefits and salary advances.[4]

Conversely, courts have identified several hallmarks which suggest an educational purpose. In the case of consolidation loans, the terms of the consolidation loan must explicitly cancel the underlying debt and create a new one in order for the loan to be "educational." *See Hiatt*, 36 F.3d at 23 (consolidation loan canceled the underlying debt, gave notice to the parties, satisfied the original lender directly, and created a new obligation); *see also Rudnicki*, 228 B.R. at 181 n. 2, and *Cobb*, 196 B.R. at 38. Unless the loan in question has been made pursuant to the Federal Family Education Loan Program ("FFELP"), 20 U.S.C. 1078–3, or some other federal program, courts have been reluctant to conclude that the creditor made the loan for an educational purpose. *Compare Lakemaker*, 241 B.R. at 580 (noting in dicta that the loan was not guaranteed by the federal government and that its terms were not consistent with the FFELP) *with Shaffer v. United Student Aid Funds, Inc. (In re Shaffer)*, 237 B.R. 617, 619–621 (Bankr.N.D.Tex.1999) (consolidation loan

---

**3.** In *Gordon,* the court held that the "business" purpose of recruiting physicians to an "under-served" region is distinguishable from the educational loans that Congress contemplated under 11 U.S.C. § 523. In *McFadyen,* the court held that there was no educational loan made where the central purpose of the hospital's program was to recruit registered nurses, and not to offer a means of financing or refinancing an education.

**4.** In *Lakemaker,* the court reasoned that hospital's loan to physician was a salary advance, and not an educational loan, because the funds served as an enticement for relocation and employment.

was a valid education loan because it was made under the FFELP).

### C. *Analysis*

■ Upon consideration of the standard for summary judgment and the case law summarized above, the Court finds that the undisputed facts viewed in the light most favorable to the Debtor compel the conclusion that Tift County Hospital did not establish that it made an educational loan to the Debtor under 11 U.S.C. § 523(a)(8). The substance of the transaction between the Hospital and the Debtor, as set forth in the Agreement between the parties, reflects a business, rather than an educational purpose for the loan.

The Court rejects the Hospital's categorization of its loan as a consolidation loan. The Hospital submitted no evidence that it required the Debtor to document his outstanding loans at the time the Agreement was signed. Moreover, it submitted no evidence that it required the Debtor to document payment of his then existing student loans. Indeed, it admitted that it made no attempt to ascertain whether the Debtor utilized the loan proceeds to pay off his existing loans, and the Debtor used the proceeds for various purposes other than to repay his student loans. Thus, the Hospital did not make a consolidation loan to the Debtor.

Although courts have been willing to assume that similar loans were in fact made for educational purposes, *In re Segal*, 57 F.3d at 347, the proper focus to determine the educational nature of the loan under § 523(a)(8) is to examine the substance of the transaction. *See DePasquale*, 225 B.R. at 832. In this case, the Debtor had completed his education at the time of the transaction, *see McFadyen*, 192 B.R. at 332–33, and the Agreement itself did contain any provisions requiring the Hospital to assume or extinguish the Debt-

or's underlying student loans. Moreover, the Agreement reflected a non-educational business purpose for the loan, namely the recruitment of a physician for an underserved rural area. The evidence presented shows that the Hospital's primary intent for entering into the loan was to further the Hospital's central charitable and business mission, and not to offer the Debtor favorable financing terms to restructure his existing educational debt. *See Gordon*, 231 B.R. at 463–65, *Cobb*, 196 B.R. at 38, *McFadyen*, 192 B.R. at 332–34.

The record is replete with clear indications of the Hospital's business purpose. The Agreement, for example, did not contain any language providing for subrogation, assumption, or discharge of the Debtor's underlying educational debt. *See, Hiatt* 36 F.3d at 23–24 ("when a borrower undertakes a consolidation loan, the original loan is repaid in full and the debt is discharged"). In fact, the recitals of the Agreement explicitly outlined the purpose of the loan—to secure the services of the Debtor, a radiologist, to Tift County, in order to satisfy the needs of the Hospital's Medical Staff Development Plan. *See Gordon*, 231 B.R. at 464–65, and *McFadyen*, 192 B.R. at 332–34. Although the Hospital issued the loan pursuant to the PRP to properly satisfy the "program" prong under § 523(a)(8), *see Segal*, 57 F.3d at 348–49 (contract with individual doctor insufficient to meet the program prong), the Agreement acted as an enticement, consistent with the text in the PRP's direct mail literature, to induce the Debtor to establish a practice in Tift County. *See, e.g., Gordon*, 231 B.R. at 464 (discharging hospital's "educational loan" to debtor and classifying it as an advance because the transaction served as an enticement to the debtor to establish a practice which fulfilled the Hospital's mission); *Lakemaker*, 241 B.R. at 580 (same).

This case is indistinguishable from *Gordon* where the court determined that the hospital's loan to the debtor could not be categorized as an educational loan of the type contemplated by Congress under § 523(a)(8) because the hospital's principal purpose for offering the loan transaction was to recruit the physician and secure his services in a rural section of Wisconsin. *Id.* at 464–65. Similarly, Tift County Hospital recruited Dr. Nies under the PRP and offered him direct financial assistance in order to obtain his medical services for the residents of Tift County. The terms of the Hospital's Agreement inextricably linked satisfaction of the $75,000 loan to Dr. Nies's fulfillment of certain service and hospital staffing requirements.

## V. CONCLUSION

Because the Debtor has raised sufficient legal grounds warranting the conclusion that the Hospital is not a student loan creditor under § 523(a)(8), the Court shall enter an order denying the Hospital's Motion for Summary Judgment.